**C. E. H. McDONNELL as Trustee in Reorganization of Equitable Plan Company, Plaintiff-Appellant-Appellee,**

v.

**AMERICAN LEDUC PETROLEUMS, LTD., et al., Defendants,**

**Matthew Berdon, Seymour Berdon,\* et al., Defendants-Appellees-Appellants.**

**Nos. 779–784, Dockets 35222, 35283, 35294, 35518, 35528 and 35532.**

United States Court of Appeals, Second Circuit.

Argued April 28, 1971.

Decided Jan. 19, 1972.

7. Cf. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

\* Seymour Berdon died on July 9, 1964. His executrix was substituted in his place.

Robert S. Stitt, New York City (Thacher, Proffitt, Prizer, Crawley & Wood, George W. Taliaferro, Jr., New York City, on the brief), for plaintiff-appellant-appellee.

Roy H. Callahan, pro se.

Samuel Becker, New York City, for defendant-appellee Benjamin C. Cohen.

Francis B. Delehanty, Jr., New York City (Corbin, Bennett & Delehanty, David E. Pitcher, Jr., New York City, on the brief), for defendant-appellee Ruby Schinasi.

Andrew Stewart, New York City, for defendant-appellant George Stewart.

Max Freund, New York City (Rosenman, Colin, Kaye, Petschek, Freund & Emil, Harvey J. Yaverbaum, New York City, on the brief), for defendant-appellee-appellant Hyman D. Lehrich.

William F. Koegel, New York City (Royall, Koegel & Wells, James B. Weidner, New York City, on the brief), for defendant-appellant Szabo Food Service, Inc. (formerly Chemoil Industries, Inc. and United Dye & Chemical Corp.).

Jay Leo Rothschild, New York City, for defendant-appellee-appellant Matthew Berdon, and defendants-appellees Seymour Berdon, Dante Ferro, Myron Ganz, Alfred A. Marks, Sadye Berdon, Ferro, Berdon & Co., Seymat Associates and Maber, Inc.

Martin Blau, New York City, for defendant-appellee Joseph D. Blau.

Joel M. Leifer, New York City (Joseph Lotterman, New York City, on the brief), for defendant-appellant Harry T. Slavin.

Before HAYS and FEINBERG, Circuit Judges, and BLUMENFELD, District Judge.[**]

FEINBERG, Circuit Judge:

C. E. H. McDonnell, the Chapter X trustee of Equitable Plan Company of Los Angeles, California (Equitable), brought this action in the United States District Court for the Southern District of New York, alleging that numerous defendants had conspired with the ubiquitous Lowell Birrell to acquire Equitable and then loot the company through various fraudulent transactions.[1] There were originally over 90 defendants, 35 of whom appeared and contested liability. The trial of this non-jury case in instalments was a herculean job, taking over 75 trial days during a period of 14 months. There were over 11,000 pages of transcript and more than 1,000 exhibits. The district judge's main opinion was over 200 pages long. The task was made even more difficult by "the bitterness which has pervaded this case," which the trial judge attributed in part to the fact that five defendants had already been criminally charged in California and acquitted in connection with many of the same acts for which plaintiff trustee sought to impose civil liability.[2] After reviewing the mass of evidence before him, the trial judge found that there had been three separate conspiracies to defraud Equitable, all led by Birrell, and held defendants Matthew Berdon, Hyman Lehrich, Harry Slavin and Roy Callahan liable as participants in one or more of these conspiracies.

George Stewart was also held liable for an unrelated transaction. Each of these defendants appeals. Defendants Ruby Schinasi, Joseph Blau, Benjamin Cohen, Ferro, Berdon & Co., Seymat Associates and Maber, Inc. were exonerated from liability with respect to their dealings with Equitable. In the case of each of these defendants, the trustee appeals. The remaining party before us, Szabo Food Service, Inc.,[3] appeals from the trial court's decision to deny Szabo costs after dismissing the trustee's suit against it.

For reasons given below, we affirm as to Blau, Cohen, the Berdon partnerships[4] and Szabo and remand for further proceedings consistent with this opinion as to Berdon, Lehrich, Slavin, Callahan, Stewart and Schinasi.

I

The trial court considered a myriad of transactions that need not be summarized here. Many of them involved defendants who have not appealed, and our disposition of the appeals makes it unnecessary to set forth the facts in great detail. The following statement deals primarily with the defendants who have appealed and merely summarizes briefly the events leading to this lawsuit. Part III of this opinion, which discusses the trustee's appeal, contains further facts relevant to those defendants who are appellees.

Equitable is a California industrial loan and finance company located in Los Angeles. Under permits issued by the California Division of Corporations, the state agency responsible for regulating industrial loan companies, Equitable was authorized to accept and pay interest on deposits from the general public. Be-

---

[**] Of the District of Connecticut, sitting by designation.

1. For other cases in this circuit involving Birrell, see e. g., Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y. 1963); McDonnell v. Birrell, 196 F.Supp. 496 (S.D.N.Y.), aff'd, 297 F.2d 731 (2d Cir. 1961).

2. The court below found four of these five defendants liable to the trustee and the

fifth—Ruby Schinasi—not liable. See Part III of this opinion. None of the four found liable has appealed.

3. Szabo was formerly known as both Chemoil Industries, Inc. and United Dye & Chemical Corporation.

4. "Berdon partnerships" refers to appellees Ferro, Berdon & Co., Seymat Associates and Maber, Inc.

tween 1953 and 1957, the years in which the alleged fraud occurred, approximately 4,500 individuals invested funds with Equitable.

In the summer of 1953, Lowell Birrell, a highly regarded businessman and attorney whose reputation only began to tarnish in 1957, decided to purchase Equitable. Birrell dispatched appellants Matthew Berdon, a certified public accountant, and Hyman Lehrich, an attorney, to investigate Equitable's financial and legal status. After lengthy negotiations with the owners of Equitable, the final closing occurred in October 1953.

In order to keep his ownership of Equitable secret, Birrell used appellee Ruby Schinasi, a wealthy widow who had had previous legitimate dealings with Birrell. Before the closing, he persuaded Mrs. Schinasi to invest in Equitable. California Investment Company (Calico), a Delaware corporation, was created to take title to Equitable's stock, and Mrs. Schinasi was told that she would be Calico's sole stockholder. Although Mrs. Schinasi believed and represented throughout the years in question that she was the real owner of Calico, and through it of Equitable, Calico's stock was actually owned by a succession of Birrell owned and controlled corporations. The trial court found that Birrell, following the acquisition of Equitable and with the aid of various defendants, orchestrated three separate conspiracies to defraud Equitable.

### The Insurance Purchase Conspiracy

Birrell arranged for Equitable to bear most of the cost of the down payment he had made to purchase the company. At a meeting of the newly elected board of directors on October 24, 1953, soon after the closing, Birrell, with Berdon's assistance, persuaded the board to replace Equitable's reserves with a credit insurance policy. The policy was purchased from Inland Empire Insurance Company through defendant Leadenhall Corporation, a Birrell controlled enterprise which had provided $250,000 of the initial $263,000 cash down payment made on the purchase of Equitable. The terms of the policy provided that $250,000 of the $639,789 premium would be non-refundable if the policy was cancelled. Since Birrell knew that the Division of Corporations would veto the insurance policy plan, he was assured that Equitable would have to terminate the insurance policy and thus eventually furnish most of the $263,000 down payment which he had made for the purchase of Equitable. The fraud was compounded by the fact that Inland Empire was subsequently willing to cancel the insurance policy at a total cost to Equitable of only $5,000, but Equitable was never so informed.

The trial court found that "Equitable was defrauded of $250,000 through the intentional deception of Equitable's board of directors by Birrell and Berdon." [5] Berdon was held liable for the $250,000 loss Equitable suffered when the Division of Corporations, as expected, ordered that the insurance policy was not an acceptable substitute for adequate reserves. The judgment against Berdon also included pre-judgment interest.

### The Insurance Premium Refund Scheme

Once the policy was cancelled and Equitable forfeited $250,000, Leadenhall became obligated to refund to Equitable $389,790, the remainder of the premium payment. On May 18, 1954, Leadenhall drew a check for that amount but did not send it to Equitable until after June 17, 1954. Equitable did not deposit the check until June 24. Before the check was deposited, Birrell, aided by Berdon and Lehrich, caused Equitable to make three loans of $150,000 each to Birrell companies. The funds passed through various accounts and were collected in the account of Birrell's law firm on June 24. On that date, the law firm drew a $400,000 check to Leadenhall, which it deposited on June 25, the same day that Leadenhall's account was charged with the refund check drawn to Equitable. By this scheme Equitable also provided

5. Concl.L. 6.

the cash for the refund of its own insurance premium.

The three loans were adequately collateralized when made in 1954, but by the time the trustee finally foreclosed after Equitable's collapse in 1957, the collateral was inadequate to liquidate the obligations. The trial court held that appellants Berdon and Lehrich along with other defendants "perpetrated a fraud upon Equitable, through a conspiracy developed by Birrell . . . , in the cancellation of the Inland Empire insurance policy . . . ." [6] Berdon and Lehrich were held liable for the outstanding balances of principal on the loans ($229,407) plus pre-judgment interest.

### The Conspiracy to Loot Equitable

Appellants Slavin and Callahan were found to be liable to the trustee for their participation in the third conspiracy. Slavin served as director and executive officer of Equitable from May 1956 to February 1957. Callahan was an officer of several Birrell owned companies.

The acts for which these defendants were held are too numerous and intricate to be fully described here. Suffice it to say that Slavin was held liable, *inter alia*, "for the losses Equitable suffered from the loans made, the loan practices adopted and followed, improper stock purchases, the acquisition of receivables he knew or should have known to be improper, the deliberate falsifications of loan instruments and documents, [and] the intentional concealment of information from the Division of Corporations . . . ." [7] Judgment against Callahan was based upon several fraudulent transactions involving Equitable in which he participated both personally and as an officer of Birrell's companies.[8] The judgment against Slavin totalled $2,-794,700 plus pre-judgment interest and against Callahan, $1,438,288 plus pre-judgment interest.

Besides finding evidence of three conspiracies, the trial court held appellant George Stewart, a stockbroker, liable for a separate transaction. The court found that Stewart agreed to purchase 50,000 shares of stock in one of Birrell's companies after Birrell promised to repurchase the stock later at a higher price. Birrell also arranged for Safeway & Co., another Birrell controlled entity, to loan $30,000 to Stewart in exchange for a promissory note signed by his wife. It was understood that Stewart would not have to repay the loan until Birrell fulfilled his promise to repurchase the stock. Safeway endorsed the note to Equitable without recourse. Stewart thereafter demanded that Birrell repurchase the stock. Birrell declined, but arranged for the note to be renewed on this and later occasions. Each time the note was made payable to Safeway by Mrs. Stewart, and Safeway endorsed the note to Equitable. When Equitable ultimately called for payment on the note in 1957, Stewart refused to pay the obligation until Birrell repurchased the stock. The entire principal and accumulated interest remains outstanding.

The trial court held that the Stewarts had "intentionally concealed from the officers and directors of Equitable the true character of the Ethel Stewart loan." [9] Both Stewarts were held liable to Equitable for the $30,000 principal plus accrued interest. Only George Stewart appeals.

### II

### Berdon, Lehrich, Slavin, Callahan and Stewart

We hold that the cases of Berdon, Lehrich, Slavin, Callahan and Stewart must be remanded for further findings of fact and conclusions of law. In view of the length of time this proceeding has already been pending, and the burdens it has imposed upon the parties, their counsel, and a careful and conscientious trial judge, we reach this conclusion reluctantly. Nevertheless, as set forth below, we find it necessary to order further proceedings. We by no means imply

---

6. Concl.L. 8.

7. Concl.L. 17.

8. See F.F. 237b–245b.

9. Concl.L. 23.

that the trial court must or should reopen the record to receive further evidence. That decision rests in its discretion based upon the situation before it. We do assume, however, that it will hear further legal argument on the issues set forth below, so many of which were not discussed in the district court opinion. Moreover, while not all of these five defendants raise all of the arguments referred to below, we believe that when an argument logically applies to any particular defendant the trial court should make the further findings and conclusions it finds necessary to conform to this opinion.[10]

There are two major problems with the basis upon which these defendants were found liable: the standard of proof used by the trier of fact, and a change in the trustee's theory of liability after the trial ended. The trial court characterized the trustee's principal cause of action against appellants as "in essence a claim based upon fraud asserted on behalf of Equitable."[11] Each of these appellants was apparently held liable for making, or participating in a conspiracy to make, fraudulent misrepresentations of fact to Equitable or for concealing, or participating in a conspiracy to conceal, facts from it when there was a duty to disclose, on which false statement or concealment Equitable relied to its detriment. The primary basis for imposing liability, in other words, appears to have been that appellants practiced fraud and deceit on the company.[12]

 Appellants [13] argue that the opinion below simply does not spell out the necessary findings to hold them liable in fraud and deceit and they empha-

size the high quantum of proof required. The trial court opinion does not make clear the standard of proof it used. This failing is especially troublesome because, under both California and New York law, fraud must be proved by "clear and convincing evidence." [14] K. King and K. G. Shuler Corp. v. King, 259 Cal.App.2d 383, 66 Cal.Rptr. 330, 338 (1968); Fein v. Starrett Television Corp., 280 App.Div. 670, 116 N.Y.S.2d 571, 573 (1952), aff'd, 305 N.Y. 856, 114 N.E.2d 210 (1953). In Barr Rubber Products Co. v. Sun Rubber Co., 425 F.2d 1114, 1120–1121 (2d Cir.), cert. denied, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970), we held that because the trial court failed to indicate in its opinion whether it found by clear and convincing evidence that a party had committed perjury, we would assume that the trial court improperly followed the more usual "preponderance of the evidence" test. The gravity of a finding such as fraud or perjury requires at least some indication that the trier of fact has found that the complaining party has met the more rigorous standard of proof. Moreover, when the fact finder is a judge, as was true in *Barr Rubber* and here, and not a jury, the defect can often be remedied on remand; a new trial is unnecessary and the record in many cases need not be reopened. Accordingly, we think this case should be remanded to allow the trial court to make specific findings consonant with the proper standard of proof.

The second substantial problem as to the basis of appellants' liability relates to the procedure used in the trial court when all the evidence was in. Until the

---

10. These assumptions, upon which we remand as to these five defendants, also apply to the remand affecting Mrs. Schinasi. See Part III–A below.

11. Concl.L. 30.

12. The court found that a corporate action against its fiduciaries for waste of assets growing out of the first two conspiracies was barred by the statute of limitations. Concl.L. 28, 29.

13. When an argument logically applies to more than one appellant, we have usually not thought it necessary in this opinion to identify the particular party making it.

14. There is no discussion in the opinion of the trial court or in the briefs of appellants of whether there is a conflict in this case between New York and California law as to fraudulent misrepresentation. Since no disparity has been raised, we do not inquire further into those conflict of laws problems.

end of the trial, the trustee had proceeded on the theory that there was one omnibus conspiracy joined in by these appellants to loot and defraud Equitable. At the close of the case, the court allowed the trustee to amend the pleadings to conform to the proof without specifying what his new theories, if any, were. As already indicated, the trial judge finally found that there had been three separate and unrelated conspiracies. According to some appellants, this was the first time they were notified of the concept of three conspiracies. These appellants claim that they were prejudiced because they had no adequate chance to defend against the specific accusations which formed the basis of the trial court's opinion. We need not decide whether this claim is correct, although it is clearly not frivolous. On remand, appellants will have an opportunity to press in the trial court those arguments which they say they were unable adequately to raise before.

To clarify and focus the issues on remand, we believe it will be helpful to discuss in some detail some of the many legal arguments raised in this court and, in a few instances—primarily where no further findings of fact are necessary and the legal issue is basic—to decide the issue.

## A. *The Trustee's Standing*

The trustee claims that he has standing under the Bankruptcy Act to sue on behalf of both Equitable and Equitable's creditors. The trial court apparently agreed, though its opinion on the issue is brief. On appeal, appellants challenge the trustee's capacity to sue on either basis, and some of the questions they raise are substantial. We will attempt here to summarize the relevant issues, but final answers must await further consideration by the trier of fact.

■ With regard to standing to sue on behalf of Equitable, the trustee relies on section 70(a) (5) of the Bankruptcy Act, 11 U.S.C. § 110(a) (5), which vests in a trustee all rights of action belonging to the bankrupt at the time the peti-

tion in bankruptcy was filed. A bankrupt corporation's cause of action for fraudulent misrepresentations made to it, such as the trustee asserts here, would pass to the trustee by virtue of this section. Whether such a cause of action exists, however, must be determined by reference to applicable state law—in this case California and New York law, the only states involved in the alleged fraudulent transactions. Appellants maintain that under the law of those jurisdictions the trustee is estopped from bringing a corporate cause of action against them. They argue that the rule has been adopted by both California and New York courts that a corporation ordinarily has no cause of action against its officers and fiduciaries for unauthorized acts, such as fraud, self-dealing, or waste, when the stockholders have unanimously consented to the transactions. See, *e. g.,* Miller & Lux, Inc. v. Anderson, 318 F.2d 831, 838 (9th Cir. 1963), cert. denied, 375 U.S. 986, 84 S.Ct. 517, 11 L.Ed.2d 473 (1964); Brainard v. De La Montanya, 15 Cal.2d 502, 116 P.2d 66, 70 (1941); Armstrong Manors v. Burris, 193 Cal.App.2d 447, 14 Cal.Rptr. 338, 342–345 (1961); Field v. Lew, 184 F. Supp. 23, 27 (E.D.N.Y.1960), aff'd sub nom. on other grounds, Field v. Bankers Trust Co., 296 F.2d 109 (2d Cir. 1961), cert. denied, 369 U.S. 859, 82 S.Ct. 948, 8 L.Ed.2d 17 (1962); Capitol Wine & Spirit Corp. v. Pokrass, 277 App.Div. 184, 98 N.Y.S.2d 291, 294–295 (1950), aff'd, 302 N.Y. 734, 98 N.E.2d 704 (1951); Kent v. Quicksilver Mining Co., 78 N.Y. 159, 184–190 (1879).

■ Appellants maintain that this rule of law precludes the trustee's action here, since they interpret the trial court's opinion as finding that Birrell was at all material times the ultimate owner of Equitable's stock. They assert, in other words, that Birrell's participation in the three alleged conspiracies amounted to unanimous consent by Equitable's sole stockholder, thus leaving the corporation with no cause of action for fraud which it could pass to the trustee. In reply, the trustee cites a num-

ber of cases, *e. g.*, Pappas v. Moss, 393 F.2d 865 (2d Cir. 1968), and Continental Securities Co. v. Belmont, 206 N.Y. 7, 18, 99 N.E. 138 (1912), and asserts that only bona fide stockholders with no interest in the transaction, which Birrell was not, can ratify a transaction and that stockholders cannot ratify acts that could not have been validly authorized in the first place, *e. g.*, fraud. See also Kent v. Quicksilver Mining Co., *supra,* 78 N.Y. at 185–186. Appellants rejoin that the cases and principles relied on by the trustee do not apply to these facts.

We find it difficult to resolve these arguments because the district court's findings with regard to ownership of Equitable leave some crucial factual issues unanswered. The trial court did find that "throughout the period of Birrell domination of Equitable," the latter was owned by Calico, which in turn "was actually owned by a succession of Birrell companies, either directly or indirectly." [15] But the trial court did not in every case identify who the stockholders of these "Birrell companies" were; [16] nor did it indicate whether any of these ultimate owners of Equitable's stock at the relevant times failed to consent to the transactions and, if so, what the legal effect of that would be. Before the appellants' arguments can be properly evaluated, these factual questions must be answered. We would expect the trial court to do so on remand. In addition, the legal arguments based upon the cases referred to above should be dealt with in the first instance by the trial court.

Appellants also attack the trustee's standing to sue on behalf of Equitable's creditors. The trustee relies on section 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e), which empowers a trustee to sue on behalf of creditors to recover from "whoever may hold or have received" any transfer made by the bankrupt that is fraudulent as against any creditor under applicable federal or state law. In this court, the trustee claims to be suing on behalf of creditors under a provision of the Uniform Fraudulent Conveyance Act, which both New York and California have enacted without change:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Cal.Civil Code § 3439.07 (West 1970); N.Y. Debtor and Creditor Law § 276 (McKinney 1945). So far as we can tell from the record on appeal, in the court below the trustee did not stress this statute as a basis of liability, including it only in a blanket reference to numerous provisions of state law. In any event, the trial judge did not discuss this theory of liability.

Appellants challenge the trustee's power to sue under section 70(e). They argue that since they neither held nor received any of the funds involved in the separate conspiracies, the trustee cannot sue them under that section. They further assert that even an allegation that they conspired to defraud creditors with one who did receive or hold the funds cannot give the trustee standing under section 70(e) to sue them. In support of this latter proposition, they cite Elliott v. Glushon, 390 F.2d 514 (9th Cir. 1967); Duell v. Brewer, 92 F.2d 59 (2d Cir. 1937); Hadden v. United States, 130 F.Supp. 610, 619, 131 Ct.Cl. 326 (1955); Irving Trust Co. v. Conte, 22 F.Supp. 94 (S.D.N.Y.1937). If on remand the trustee continues to rely on section 70(e) as a basis for standing, the trial court must then consider several questions, *e. g.*, whether the authorities cited above are applicable to the facts of this case (some appellants may actually have held or received fraudulently acquired funds or may properly be so regarded by disregarding corporate fictions, *cf.* Eisenrod v. Utley, 211 F.2d 678–681 (9th Cir. 1954)) and whether the interpretation of section 70(e) urged by appellants to

---

15. F.F. 119.

16. See F.F. 6.

us is correct. See Brainard v. Cohn, 8 F.2d 13 (9th Cir. 1925); *cf.* Bartle v. Markson, 357 F.2d 517, 522 (2d Cir. 1966), and the district court opinion in the same case on remand, Bartle v. Markson, 299 F.Supp. 958 (N.D.N.Y.1969), aff'd, 423 F.2d 637 (2d Cir. 1970) (*per curiam*). As indicated above, these issues were not discussed by the trial judge.

## B. *Jurisdiction over Slavin*

■ Slavin argues that the judgment against him must be reversed because the court never properly acquired *in personam* jurisdiction over him. The issue arises in the following context: In the summer of 1959, Slavin was served at his home in Fairlawn, New Jersey, with a subpoena *duces tecum* requiring his appearance in connection with In re Equitable Plan Co., Debtor, file No. 93,698. The trustee of Equitable had instituted that ancillary proceeding in the United States District Court for the Southern District of New York under section 167 of the Bankruptcy Act, 11 U.S.C. § 567. Slavin duly appeared and was requested to return several days later. Upon leaving the courthouse after his second appearance, he was served with a supplemental summons and the first amended complaint in this action. In his answer, Slavin asserted the defense of lack of personal jurisdiction and then, in December 1967, moved to quash the service of process and to dismiss the complaint against him. Slavin relied on the general federal rule that a non-resident witness is immune from federal service of process while attending a judicial proceeding in which his testimony is needed. See Stewart v. Ramsay, 242 U.S. 128, 37 S.Ct. 44, 61 L.Ed. 192 (1916); 2 J. Moore, Federal Practice ¶ 4.20 (2d ed. 1970). In January 1968, Judge Palmieri denied the motion in open court on two grounds: Slavin did not appear voluntarily in the section 167 proceeding; and that proceeding and the present plenary action

are so closely related that immunity should be withheld.[17]

As to the first ground, Slavin argues that this and other federal courts have held that immunity from service is granted to witnesses whose appearance is compelled as well as to those who appear voluntarily. Although it is often said that the purpose of granting immunity is to encourage the voluntary attendance of non-resident witnesses, Slavin appears to be correct. Certainly, the venerable decision in Dwelle v. Allen, 193 F. 546 (S.D.N.Y.1912) (L. Hand, J.), supports this position. See also Shapiro & Son Curtain Corp. v. Glass, 348 F.2d 460 (2d Cir.), cert. denied, 382 U.S. 942, 86 S.Ct. 397, 15 L.Ed.2d 351 (1965). This extension of the federal immunity rule has been criticized, see 4 Wright & Miller, Federal Practice and Procedure: Civil § 1081 (1969); *cf.* United States v. Green, 305 F.Supp. 125, 128 (S.D.N.Y.1969), but we think it inappropriate in the context of this litigation to undertake a re-examination of the question.

Nonetheless, we conclude that the second ground of the district court's ruling justifies withholding immunity from service of process in this action while Slavin was attending the section 167 proceeding. In the famous decision of Lamb v. Schmitt, 285 U.S. 222, 228, 52 S.Ct. 317, 319, 76 L.Ed. 720 (1932), the Supreme Court recognized that the relationship between the "principal suit" and a second proceeding, in which the contested service is made, may be such that immunity "if allowed, would so obstruct judicial administration in the very cause for the protection of which it is invoked as to justify withholding it." To be sure, this court has held that mere similarity of subject matter in two proceedings does not itself justify withholding immunity for purposes of service in the second. See Shapiro & Son Curtain Corp. v. Glass, *supra;* In re Equitable Plan Co., 277 F.2d 319 (2d Cir. 1960). But here there is a much closer relationship than

---

17. Slavin moved in this court for relief allowing him to appeal the district court's ruling without the necessity of appearing at trial. That motion was denied in March 1968.

in those two cases between the first and second proceedings. Unlike the situation in In re Equitable Plan Co., *supra*, 277 F.2d at 321, the trustee in the first proceeding attended by Slavin is the plaintiff in the second, and these two proceedings involve vindication of the same cluster of rights and interests. More importantly, the very purpose of a section 167 investigation is to uncover for ·the trustee conducting it possible causes of action, including actions against those called to testify. 6 Collier On Bankruptcy ¶ 7.19[1] (14th ed. 1969). In this case, the earlier section 167 proceeding was actually used as a discovery device for the present action. As the district court noted in the preliminary statement to its opinion:

> Only five depositions were taken by the plaintiff, most of his pretrial preparation being based upon the record of examinations conducted pursuant to Section 167 of Chapter X of the Bankruptcy Act. . . .

The present suit against Slavin carried out the purpose of the earlier section 167 proceeding. See 4 Wright & Miller, Federal Practice and Procedure: Civil § 1080 (1969). Indeed, this is precisely what the district court found:

> [W]here you have two proceedings that are as closely related as this, both of them seeking substantially the same objectives, namely, the discovery, the prosecution of claims on behalf of depositors of the Equitable Plan Company, it seems to me that the reason for the immunity has been swept away and that this man cannot complain because the very subject matter for his appearance in the first instance is the subject matter for the lawsuit which is being brought against [him].

Accordingly, it was within the discretion of the district court to withhold immunity.[18]

Our disposition of the only issue Slavin has raised on appeal would ordinarily

dictate simply affirming the judgment entered against him. However, in view of our resolution of other issues raised by the appealing co-defendants, particularly the issue of the required standard of proof, we believe that equity and good sense require that Slavin's case also be remanded for further findings and conclusions consistent with this opinion.

### C. *The Effect of Callahan's Discharge in Bankruptcy*

In 1964, after the present suit was filed but while it was still pending, Callahan received a discharge in bankruptcy from the United States District Court for the District of Connecticut. In the court below, Callahan argued that his discharge in bankruptcy barred this action against him. The trial court rejected this defense, and Callahan continues to press his claim on appeal.

The trial judge first noted the general rule that "under the Bankruptcy Act claims based on tort, such as wilful or negligent injury to person or property, are ordinarily not provable in bankruptcy and thus are not dischargeable." [19] See 3A Collier On Bankruptcy ¶ 63.25[1] (14th ed. 1969). The judge further concluded that, even assuming the trustee's claim against Callahan was provable in the latter's bankruptcy proceeding in Connecticut, the claim was not dischargeable because it fell within section 17(a) (2) of the Bankrupcty Act, 11 U.S.C. § 35(a) (2), which provides that:

> A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to

---

18. On this view, it is not necessary to deal with the trustee's alternative argument that jurisdiction existed over Slavin under N.Y.C.P.L.R. § 302 (McKinney 1963).

19. Memorandum of Opinion, July 20, 1970, at 9. This opinion accompanied the final judgment and was filed some two months after the main opinion.

be made or published in any manner whatsoever with intent to deceive, or for willful and malicious [injuries to the person or property of another] . . . .[20]

The court further held that section 63(a)(7) of the Bankruptcy Act, 11 U.S.C. § 103(a)(7), which provides that:

> Debts of the bankrupt may be proved and allowed against his estate which are founded upon . . . the right to recover damages in any action for negligence instituted prior to and pending at the time of the filing of the petition in bankruptcy. . . . ,

was inapplicable to this case because "plaintiff's suit is not based on negligence."

Callahan argues to us that the trustee's claims against him were provable and dischargeable. For example, he says that all of the trustee's claims are covered by section 63(a)(4), 11 U.S.C. § 103 (a)(4), which provides that debts founded upon express or implied contracts are provable and hence dischargeable. Callahan also argues that none of the claims against him falls within the exceptions of section 17(a)(2), contrary to the decision below. In view of the necessary remand as to all of these defendants including Callahan, further clarification as to these issues seems appropriate. It would be helpful if on remand the district court would specify upon which portion of section 17(a)(2) it relies, see generally 1A Collier On Bankruptcy ¶¶ 17.-15-17 (14th ed. 1969), and would separately rule upon the various arguments Callahan has made to us.

### D. *Bases of Liability*

Appellants also raise many other arguments relating to the factual and legal bases on which the trial court held them liable. In view of the remand, these contentions are better addressed to the trial

court. But we think it appropriate to mention a few.

■ Appellants assert that the district court either failed to find or improperly found one or more of the traditional elements that together make up an action for fraud under both California and New York law. *E. g.*, citing, *inter alia,* Neblett v. Elliott, 46 Cal.App.2d 294, 115 P.2d 872 (1941), and Harte & Co. v. Shayani, 33 Misc.2d 680, 227 N.Y.S.2d 538 (1962), aff'd, 20 A.D.2d 968, 251 N.Y.S.2d 414 (1964), Lehrich argues that to hold him liable as a participant in the second conspiracy the court must find that he had knowledge of the conspiracy. Yet, he claims, the district court only found that "Lehrich knew, or at the very least should have known, of the collusive nature of Leadenhall's refund and the June, 1954, loans."[21] Lehrich also claims that he was not a fiduciary of Equitable and that the court nowhere made clear why he was so characterized. Finally, Lehrich argues:

> The Court below stated that a fraud was committed but it made no findings setting forth what was the misrepresentation or concealment (plus duty to disclose) to Equitable the material nature thereof, the manner in which Equitable relied thereon or the injury Equitable suffered as a consequence of the fraud. In short, the Court, in its findings, did not set forth any of the facts requisite to a cause of action in fraud under the California or New York authorities.[22]

Appellant Callahan, citing, *inter alia,* Wishnick v. Frye, 111 Cal.App.2d 926, 245 P.2d 532 (Cal.Ct.App.1952), and Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), argues that proof of scienter is required in an action for fraud or deceit; yet, the district court held him liable for fraud for his involvement in "transactions . . . in

---

20. When Congress amended the Bankruptcy Act in 1970, the bracketed language was moved to section 17(a)(8) and replaced with the words "conversion of the property of another." See 1A Collier On

Bankruptcy ¶ 17.15 n. 45b (14th ed. 1969).

21. F.F. 121.

22. Brief for Appellant Lehrich at 22.

·which he participated with actual *or imputable* knowledge." [23] (Emphasis added.) On remand, the trial court should make the requisite findings for an action based upon fraud and should clarify these alleged inconsistencies.

Not all the appellants, however, appear to have been held liable for fraudulent misrepresentation alone. The trial court distinguished between the corporation's cause of action for fraud and its right of action for waste of corporate assets. As to the latter, it held that the applicable statute of limitations barred any action for "waste or injury to property occurring prior to March 17, 1956." [24] This conclusion, however, did not bar an action for waste against Callahan and Slavin, who were held liable for participating in the third conspiracy between June 1956 and February 1957. But the district court's conclusions of law with respect to Callahan's liability do not make clear whether the judgment was based on a theory of fraud or on a theory of corporate waste or on both.[25] On remand, *the actual basis of liability should be clarified.*

We are also unable to determine from the lower court's opinion whether George Stewart was held liable for making fraudulent misrepresentations to Equitable with regard to the promissory note signed by his wife or whether, as the trustee argues to us, liability was also imposed on an undisclosed principal theory because he received and used the funds.[26] As with the other appellants, therefore, the district court should provide a fuller explanation of the basis of liability.

The trial court's opinion also has several references to various appellants' breaches of their duty to keep the Division of Corporations accurately informed of certain facts, *e. g.,* the ownership of Equitable, its insolvency at acquisition, and the fraudulent nature of the credit insurance policy and subsequent premium refund.[27] The court found that "Berdon, Blau, and Slavin breached their duty when they failed to correct the misinformation previously supplied to Equitable's directors and certificate holders, and to the Division." [28] Yet, the court appears to have concluded that only Slavin should be held liable for this failing.[29] In this court, much has been made of the failure of various defendants to keep the Division abreast of certain events. Before liability can be imposed under this theory, however, we think a fuller explanation of the nature of this "duty" is required. *E. g.,* was the duty to inform the Division owed to Equitable, so that the trustee is enforcing the latter's right, subject to the problem of standing already mentioned? Or, in connection with this "duty," is the trustee suing in some other capacity that has not been made clear?

### E. *Damages*

Appellants raise a number of issues regarding damages, particularly with respect to the second conspiracy. After holding that "California clearly has the strongest interest in the measure of damages to be applied," the trial court surveyed California law to find the rule of damages applicable to this case:

> In general, California provides an out-of-pocket rule of damages for use

---

23. Concl.L. 18.

24. Concl.L. 29.

25. The court also held Callahan "liable for the conversion by Keta [a Birrell controlled corporation of which Callahan was president] of $149,048.42 in payments received by Keta, through Mrs. Prior and himself, and owing to Equitable." Concl. L. 18. Callahan argues on appeal that the trial court improperly based its finding of conversion on a mere showing of negligence, rather than intent to convert. See

F.F. 243b. Once again, this argument may be more properly considered in the trial court on remand.

26. See F.F. 325c, Concl.L. 23 and Memorandum of Opinion, July 20, 1970, at 10–13.

27. See, e. g., F.F. 147a, 195a, 201a.

28. Concl.L. 5. Blau's role in this case is discussed in Part III–B of this opinion.

29. See Concl.L. 5, 17.

in fraud cases. Calif.Civ.Code § 3343. Under this standard, a defrauded plaintiff recovers the difference between the value of that with which he parted and the value of what he received in return. See generally Walsh v. Hooker & Fay, 212 C.A.2d 450, 28 Cal.Rptr. 16 (Calif.Ct.App.1963); Simone v. McKee, 142 C.A.2d 307, 298 P.2d 667 (Calif. Ct.App.1956). However, the California courts hold that, where the defrauding party stands in a fiduciary relationship to the victim of the fraud, then the broader provisions of the California Civil Code regarding damages, Calif.Civ.Code §§ 1709, 3333 apply. Walsh v. Hooker & Fay, *supra* at 458–461; Prince v. Harting, 177 C.A.2d 720, 2 Cal.Rptr. 545 (Calif.Ct.App.1960); Simone v. McKee, *supra* at 315; Anderson v. Thacher, 76 C.A.2d 50, 172 P.2d 533 (Calif.Ct.App.1946). These sections enunciate a "benefit of the bargain" rule for damage assessment, under which a plaintiff recovers

> the amount which will compensate for all the detriment proximately caused [by the defendant's breach of an obligation other than contract], whether it could have been anticipated or not.

Calif.Civ.Code § 3333.[30]

The district court went on to apply the "benefit of the bargain" measure of damages. Appellants do not appear to disagree with the trial court's conclusion that California law should govern the issue of damages as to this conspiracy, but they do question the lower court's interpretation of California law. They argue that under California cases the "benefit of the bargain" rule of section 3333 is applicable only when a party to a fiduciary arrangement seeks to recover secret profits, which is not the case here. Thus, according to appellants, the proper measure of damages to apply to the three $150,000 loans from Equitable to Birrell companies to carry out the insurance premium refund scheme was the "out of pocket" loss. Under that rule, they say, defendants could not have been found liable because the loans were adequately collateralized when made.

■ We hold that the trial court properly interpreted California law on this issue. Although some of the decisions the court cited may have involved plaintiffs who sought to recover only secret profits, the courts did not hold that the "benefit of the bargain" rule was only applicable to such cases. And one decision cited by the trial court, Walsh v. Hooker & Fay, *supra*, specifically rejected the contention advanced by appellants here. See also Northwestern Title Security Co. v. Flack, 6 Cal.App.3d 134, 85 Cal.Rptr. 693, 699 n. 3 (Ct.App. 1970) (dictum). Appellants assert that *Walsh* is an aberration under California law, citing Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534, 537 (1959), but the argument is hardly compelling. The court in *Walsh* was aware of the opinion in *Ward*. Moreover, plaintiff in *Ward* asked only for recovery of secret profits, and the court found that there was no fiduciary relationship. Accordingly, the court in *Ward* was not confronted and did not deal with the situation presented either here or in *Walsh*. We concur, therefore, in the trial court's reading of California law on this issue. We note that this conclusion merely reemphasizes the need for the trial court on remand to set forth precisely the legal and factual basis for finding that a conspirator was a fiduciary of Equitable.

However, this by no means resolves all of the issues regarding damages raised by appellants. *E. g.*, again referring to the second conspiracy, the point is strongly pressed that the alleged misrepresentations or concealment did not concern the value of the collateral for the three $150,000 loans and therefore could not be the proximate cause of damage resulting years later when the value of the collateral dropped. In addition, the arguments are made that the judgment gave no credit for the salvage value of

---

30. Memorandum of Opinion, July 20, 1970, at 3.

some of the collateral on these loans and did not take account of the repayment of principal down to $82,000 on one of the loans. So far as we can tell, these points are not dealt with in the opinion of the court below and, on remand, should be. Appellants also protest that the award of pre-judgment interest was improper as a matter of law and that, in any event, the trial judge thought he was compelled to award such interest on the mistaken view that New York law governed,[31] whereas the matter was one for his discretion under California law.[32] The pre-judgment interest awarded was substantial.[33] The question whether California or New York law applies as to pre-judgment interest raises substantial conflict of law questions, which do not arise if the court below awarded pre-judgment interest as a matter of discretion. On remand, the court should make clear whether it regards the award of pre-judgment interest as mandatory or discretionary and, if the latter, whether the amounts already awarded stand.[34]

A few final words are appropriate regarding the remaining arguments of these appellants. We do not suggest that we have dealt with all of the contentions raised in this court. We have not, primarily because in view of the remand it seemed appropriate not to discuss all of them.[35] Moreover, some of the other arguments before us were not discussed in the opinion of the trial court, and we think it appropriate for that court to give us the benefit of its views in the first instance.

## III

### *The Trustee's Appeal*

The trustee appeals from the district court's decision entering judgment for defendants Mrs. Schinasi, Joseph Blau, the Berdon partnerships and Benjamin Cohen. We remand the case of Mrs. Schinasi, but otherwise affirm as to these defendants.[36]

We note at the outset that our holding that the trial court may have improperly applied the preponderance of the evidence standard of proof rather than the more rigorous clear and convincing standard only reinforces the trial court's determination that these defendants are not liable to the trustee on the causes of action he asserted. A failure to prove fraud by a preponderance of the evidence necessarily implies a failure of proof by clear and convincing evidence.[37]

### A. *Mrs. Ruby Schinasi*

■ After serving as an unknowing participant in Birrell's surreptitious purchase of Equitable, Mrs. Schinasi held various fiduciary positions with Equitable: director from October 1953 to July 1957; president from April 1954 to February 1957; and chairman of the board

31. N.Y.C.P.L.R. § 5001 (McKinney 1963).

32. Cal.Civ.Code § 3288 (West 1970).

33. E. g., Lehrich computes the pre-judgment interest component as $227,000 out of a judgment against him of $457,000.

34. Implicit in this discussion is our rejection of appellants' contention that in either event an award of pre-judgment interest was improper as a matter of law. We express no view, however, as to whether the trial court, in its discretion (if it concludes that to be the governing standard), should award pre-judgment interest.

35. We do note, however, that Berdon's claim that, as an accountant, he "was obligated by professional standards" not to disclose what he knew about Birrell is irrelevant since the district court properly found that Berdon's services "went beyond questions of accountancy and managerial technique." F.F. 144a.

36. Gerard F. Re and Jerry A. Re, defendants below, have filed with this court a joint brief as appellees. In that brief they correctly note that the trustee has not appealed the trial court's decision holding them not liable, but nonetheless ask that we affirm that decision. We decline this novel and unnecessary invitation.

37. With this observation in mind, we reject the trustee's argument that various defendants, e. g., Berdon and Lehrich, who were held liable on the first or second conspiracies, should also have been held liable for the damages resulting from the third. The trial judge refused to so rule. We have reviewed the record and conclude that the judge's findings on this issue are not clearly erroneous. As to this portion of the case, we affirm.

from February 1957 to July 1957. Yet, despite these officerships, Mrs. Schinasi never took an active role in the management of the company. The trial court found that Mrs. Schinasi had complete trust in Birrell. She referred to him any matters that either she or others found questionable and always accepted his explanation and assurance that the complaint would be investigated and the problem corrected. And whatever role she had in the company's affairs diminished substantially after she promised under oath at hearings before the Division of Corporations in April 1955 to leave the management of the company to the other executives.

On these facts the trial court held that Mrs. Schinasi was not a knowing participant in any of the alleged conspiracies:

> Mrs. Schinasi was not aware of any concerted plan to acquire Equitable with its own funds or to misappropriate those funds after acquisition. She did not plan with anyone to effect or to further those ends. Throughout her association with Equitable, she acted in good faith.[38]

This finding of fact is well supported by the record and certainly is not clearly erroneous.

On appeal the trustee has abandoned his claim that Mrs. Schinasi participated in a conspiracy to commit fraud on Equitable and now asserts only that she is liable for negligently breaching her duties as an officer and director of Equitable. The trustee argues that officers and directors of financial institutions, such as Equitable, bear a greater fiduciary responsibility than their counterparts in ordinary business corporations—a responsibility so great that even good faith or lack of knowledge is no defense to the charge of neglect of one's corporate office.

Mrs. Schinasi argues that this claim of "passive negligence" or "nonfeasance rather than malfeasance" is a new theory of liability not urged below. It is not clear whether this criticism is completely accurate, since the trustee did assert as his first cause of action against various defendants, including Mrs. Schinasi, a claim of breach of fiduciary duty. But the argument now made to us by the trustee is not discussed in those terms in the district judge's opinion. We would ordinarily be reluctant to allow a party, even a trustee, to assert now an alternative basis of liability, which apparently was not vigorously pressed in the trial court. But, in view of the necessity of further proceedings with respect to other defendants, the complexity of this litigation, and the fact that the trustee protects the interests of thousands of creditors, we choose to remand Mrs. Schinasi's case along with those of the defendants mentioned in Part II, so that the district court can consider the trustee's theory urged here. Only a few aspects of this claim need be mentioned before remand. First, since the trustee apparently asserts this claim on behalf of Equitable, the standing problem discussed in Part II of our opinion is applicable here as well, and, must be dealt with by the trial court. Second, the trustee can only recover from Mrs. Schinasi for breach of fiduciary duty after March 17, 1956, since the trial court has already held that the applicable statute of limitations bars any recovery before that date on that theory.[39] The trustee has not challenged that conclusion and we see

---

38. F.F. 139a.

39. Applying New York law, see Austrian v. Williams, 198 F.2d 697 (2d Cir.), cert. denied, 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701 (1952), the district court held that in this case New York courts would follow N.Y.C.P.L.R. § 202 (McKinney 1963), the New York "borrowing statute," and apply the California two-year limitations period applicable to actions brought on behalf of a corporation against officers, directors or stockholders for waste or injury to property. Cal.Code of Civ.Pro. § 339 (West 1954). The court concluded that since the petition for reorganization was filed March 17, 1958, the trustee's cause of action on behalf of Equitable was barred as to acts committed two years before that date, or March 17, 1956. See Concl.L. 28, 29.

no reason to disturb it. Third, the trial court must consider whether New York and California law differ as to the standard of care required of officers and directors of corporations such as Equitable, and, if so, which law is applicable to Mrs. Schinasi.[40]

### B. *Joseph Blau*

Joseph Blau served as co-manager (along with Joseph Seltzer) of Equitable between February 1955 and May 1956, under an employment contract which was noncancellable as long as Equitable was operated profitably. According to the district court opinion, Blau terminated his employment contract with Equitable shortly after learning for the first time in April 1956 that Birrell was the actual owner of Equitable. Birrell had not possessed effective control over Equitable during Blau's tenure, and relations between the two had steadily deteriorated as Blau refused to make certain loans urged by Birrell. When Blau terminated his contract he secured a general release from Equitable, through which he sought to absolve himself from any liability arising out of his management of the company.

The trial court exonerated Blau from liability, finding that Equitable was managed properly, and even profitably, during his office. The court found that:

> [E]ach secured loan when made was adequately collateralized, and remained protected until after May, 1956; unsecured loans were made on the basis of net worth statements showing sufficient assets to cover the obligation. Additionally, interest and principal payments were kept current through collection efforts. The making of these loans provides, in and of itself, no basis for liability against Blau; loans which have not been repaid constituted acceptable investments when made, and became delinquent, or were permitted to become delinquent, after May, 1956.[41]

On this factual basis, the court concluded that there was no conspiracy to loot Equitable during Blau's tenure. Alternatively, the court held that the general release which Blau secured upon his retirement effectively insulated him from any liability to Equitable.

On appeal the trustee does not appear to take issue with the district court's finding that the financial affairs of Equitable were properly managed during Blau's term of office. Rather he objects to another conclusion reached by the trial court, the relevant portion of which was as follows:

> At no time was the Division of Corporations informed of the true owner of Equitable. Berdon, Blau, and Slavin breached their duty when they failed to correct the misinformation previously supplied to Equitable's directors and certificate holders, and to the Division. However, only in Slavin's case did detriment to Equitable result. The Division would not have acted differently prior to April, 1955, had it known of Birrell's ownership. The company was operated properly during Blau's tenure. On the other hand, Slavin's concealment of Birrell's ownership, when coupled with concealments relating to Equitable's operations, permitted Birrell surreptitiously to loot the company without intervention from the Division.[42]

The trustee contends that the lower court erred in concluding that no damage was inflicted on Equitable by Blau's "breach of duty." He argues that Equitable was harmed eventually during Slavin's tenure and that Blau should be held responsible.

 We affirm the district court's decision with regard to Blau. Although we express no opinion as to the validity of the court's finding that Blau "breached his duty" by failing to accurately inform the Division of Corporations,[43] we think the evidence supports the court's conclusion that Equitable was

---

40. Cf. note 14 *supra.*

41. Concl.L. 10.

42. Concl.L. 5.

43. See notes 27–29 *supra* and accompanying text.

not damaged by Blau's nondisclosure. We agree with the trial judge that Blau, who apparently ran Equitable efficiently and honestly, should not be held liable for Slavin's later misconduct.

### C. *Berdon Partnerships*

Seymour Berdon, Dante Ferro, Myron Ganz and Alfred Marks were all certified accountants and partners with Matthew Berdon in the firm of Ferro, Berdon & Co. Seymour Berdon was also associated with Matthew Berdon and Sadye Berdon in the firm of Seymat Associates, which apparently subsequently became Maber, Inc.

The trial court refused to hold these partnerships liable for the acts of Matthew Berdon. It found that Ferro, Berdon & Co. only performed legitimate accounting work for Equitable, including investigating Equitable's books and accounts and preparing its tax returns. The court also determined that Seymat Associates and Maber, Inc. served merely as a conduit for Matthew Berdon to receive the non-accounting and retainer fees he earned as "New York coordinator of Equitable's activities." The district court concluded that:

> The additional, individual activities of Matthew Berdon relating to Equitable's acquisition were not performed on behalf of Ferro, Berdon . . . .
>
> . . . Matthew Berdon's work as overseer of Equitable was not performed on behalf of Ferro, Berdon.
> . . . Matthew Berdon's activities as an individual include his actions in relation to Equitable's credit insurance policy, the change of Equitable's loan policy, the cancellation of the credit insurance policy, and the fraudulent June, 1954, loans through which that policy and claims under it were settled.[44]

We think the district court's findings are well supported by the evidence and in conformity with the applicable law. Under both New York and California law a partnership is only liable for the acts of a partner when those acts were performed in the usual course of the partnership business. See Gerdes v. Reynolds, 28 N.Y.S.2d 622, 646 (Sup. Ct.1941); Cal.Corp.Code § 15013 (West 1955). Here the court held Matthew Berdon liable for acts committed outside the scope of his partnership activities, as a fiduciary of Equitable.

In view of the court's findings as to the role played by the Berdon partnerships in the alleged fraudulent activities, we see no reason to remand their cases for further findings. Accordingly, we affirm the trial court's decision.

### D. *Benjamin Cohen*

Benjamin Cohen acted as a financier in Birrell's purchase of Equitable. He provided "front money," or temporary financing for a commission, a service which the trial court found "was in itself neither illegal nor uncommon."[45] Most importantly, the court determined that "Cohen was not aware of and did not participate in, any plan to despoil Equitable or to acquire Equitable for that purpose."[46] The court concluded that the trustee had "failed to establish that Cohen's involvement in the acquisition went beyond the providing of front money in the usual course of Cohen's business."[47]

The trustee challenges these findings, but in our view he has not shown them to be clearly erroneous. Fed.R.Civ.P. 52(a). Accordingly, we affirm the trial court's decision with respect to Cohen.

### IV

*Szabo Food Service*

The final issue before us concerns the appeal of Szabo Food Service, Inc., one of the defendants successful on the merits. After the trial court held that the trustee had failed to establish that Szabo had participated in the alleged conspiracies and dismissed the complaint against it,

44. F.F. 345c.

45. F.F. 29.

46. F.F. 272c.

47. F.F. 275c.

Szabo submitted to the court a bill of costs covering:

> stenographic expenses for one copy of daily transcript obtained by Szabo for use in the trial and an allocable portion of the cost of the Court's copy of the transcript; travel expenses from Philadephia to New York City for one of Szabo's two witnesses at trial; docket fees; and reproduction costs for numerous of plaintiff's trial exhibits.[48]

The court refused to award costs to Szabo and to the other parties, stating:

> In view of the necessarily complex and protracted nature of the present litigation, it is the opinion of the Court that costs should not be taxed against any party. It should be noted that the plaintiff has refrained from asking for costs because several of the defendants held liable are unable to pay the amounts assessed as damages against them, and because other defendants were not held liable on all of the claims asserted against them.[49]

 We affirm. It is well-settled that under Fed.R.Civ.P. 54(d), the awarding of costs is discretionary with the trial judge. See Oscar Gruss & Son v. Lumbermens Mut. Cas. Co., 422 F.2d 1278, 1284–1285 (2d Cir. 1970); Syracuse Broadcasting Corp. v. Newhouse, 319 F.2d 683, 690 (2d Cir. 1963). And in suits by trustees in bankruptcy, there is precedent for exercising that discretion to deny costs to successful defendants. See Irving Trust Co. v. Deutsch, 2 F.Supp. 971, 995 (S.D.N.Y.1932), rev'd in part on other grounds, 73 F.2d 121 (2d Cir. 1934), cert. denied, 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935). In this case, we are not persuaded that the trial court's denial of costs to the exonerated defendant Szabo constituted an abuse of discretion.

Judgment affirmed as to defendants Blau, Cohen, the Berdon partnerships and Szabo. Case remanded for further proceedings consistent with this opinion as to defendants Berdon, Lehrich, Slavin, Callahan, Stewart and Schinasi.

HAYS, Circuit Judge (concurring and dissenting):

I agree with the majority's disposition of the cases of Szabo, Berdon & Co., Seymat Associates, and Maber, Inc. However I would affirm as to Berdon, Lehrich, Slavin, Stewart, and Callahan and reverse as to Schinasi, Blau, and Cohen.

Remanding certain of these cases on the ground that the district judge did not state what standard of evidence he applied seems to me to be wholly unjustified. When the record on appeal does not disclose what rule of law the district judge applied, it is presumed that the district judge correctly applied the applicable law. State Fuel Co. v. Gulf Oil Corp., 179 F.2d 390, 396 (1st Cir. 1950); Revlon Inc. v. Buchanan, 271 F.2d 795, 796 (5th Cir. 1959); Goodall Co. v. Sartin, 141 F.2d 427, 435 (6th Cir.), cert. denied, 323 U.S. 709, 65 S.Ct. 34, 89 L.Ed. 571 (1944); Eisbach v. Jo-Carroll Electrict Cooperative, Inc., 440 F.2d 1171, 1173 (7th Cir. 1971); Barnett v. Terminal Railroad Ass'n of St. L., 228 F.2d 756, 758 (8th Cir.), cert. denied, 351 U.S. 953, 76 S.Ct. 850, 100 L.Ed. 1476 (1956); Bankers Life Co. v. Bowie, 121 F.2d 779, 781–782 (10th Cir. 1941). Barr Rubber Prods. Co. v. Sun Rubber Co., 425 F.2d 1114 (2d Cir.), cert. denied, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970), cited by the majority, is inapposite. In that case, this court held, for the first time, that a finding of perjury must be supported not merely by a preponderance of the evidence but by clear and convincing evidence. The court was formulating a new rule. It was reasonable to assume that the district court had not anticipated that the change would be made. In the present case the rule is well established in both California and New York that fraud must be proved

---

48. Brief for Appellant Szabo at 4.

49. Memorandum of Opinion, July 20, 1970, at 14.

by clear and convincing evidence. There is therefore no basis for assuming that the district court did not follow the correct rule. There is no justification whatsoever for equating silence with error.

In any event, even if the judge considered himself governed by a lower standard, the evidence is plainly adequate to meet the requirements of the higher standard.

As to Schinasi, Blau, and Cohen, the evidence was sufficient to require that judgment be entered against them.