MITCHELL FEIN et al., Respondents, *v.* STARRETT TELEVISION CORPORATION et al., Appellants.

First Department, November 12, 1952.

*George Trosk* of counsel (*Nathan A. Markowitz* and *Harry Mandell* with him on the brief; *Nathan A. Markowitz*, attorney), for appellants.

*Milton Paulson* for respondents.

VAN VOORHIS, J.  Defendants appeal from a judgment vacating, on the ground of fraud, transfer of 49% of the common stock of defendant Starrett Television Corporation (hereafter called Starrett) from plaintiffs to defendant Jacob Freidus (hereafter called defendant).

Plaintiffs supplied the know-how and defendant the money for the development of the business of Starrett.  Fein was a mechanical engineer who had been engaged in industrial and management engineering.  He was also a business consultant.  Daniels had been engaged for twenty years in various branches of the radio business, and during part of that time in television.  Defendant, a successful businessman in other fields, was unfamiliar with the television industry.  Plaintiffs proposed to him in 1948, that he supply $10,000 of capital in order that all three might engage in the business of rebuilding small television sets into larger ones.  Subsequently plaintiffs recommended that the corporation shift to assembling new sets.  They expanded rapidly, requiring increased capital, until by March 30, 1950,

defendant had invested more than $900,000. Plaintiffs had invested nothing except their time and technical skill. By the date mentioned, the corporation required still more money. Defendant eliminated over $500,000 of the corporation's existing debt to him by converting it into preferred stock and by making donations to surplus. At about this time, he and plaintiffs signed an agreement predated December 20, 1949, reciting that Starrett was in urgent need of additional funds not obtainable through any banking or loan channels, and that plaintiffs were willing to pledge their stockholdings in Starrett to defendant as security for the repayment of indebtedness then owing to him by the corporation and for future demand loans which he might make to the corporation. This agreement provided that in event that such indebtedness were repaid when demanded, defendant would reassign said stock to plaintiffs, but that otherwise title to plaintiffs' shares should be in him. Plaintiffs were to have five days after demand for repayment by defendant in which to save their interests by procuring the refunding of outstanding loans. The parties must have had confidence in the future of the business, but it is reasonable to believe, as the statements show, that, like many other businesses in their promotional stages, it was being operated at a loss or, at least, with a serious shortage of working capital. On May 3, 1950, after defendant had demanded repayment of his indebtedness, which plaintiffs had without success endeavored for a considerable time to refinance elsewhere, they executed absolute transfers of their shares to defendant.

The trial court set aside as fraudulent these assignments, and the contract dated December 20, 1949, pursuant to which they were made, upon the basis of findings that the transfer of plaintiffs' shares was induced by false representations by defendant that he required them for collateral to loans that he was to obtain personally from outside sources, the proceeds whereof were to be loaned by him to Starrett. Plaintiffs, although their versions are not entirely consistent with each other, testified in substance that defendant told them that when *he* repaid these prospective loans, which he expected to do by selling his real estate holdings, their shares would be returned to them. The trial court also found that defendant told plaintiffs that neither the agreement dated December 20, 1949, nor the formal assignments of plaintiffs' shares made May 3, 1950, would have any legal force or effect.

The only evidence of importance which plaintiffs adduced to establish, under *Adams* v. *Gillig* (199 N. Y. 314), that defendant deliberately falsified his intentions when these documents were signed, is that a few weeks before the agreement dated December 20, 1949 was made, defendant had been looking for other executives to take the place of plaintiffs in operating the company. Inasmuch as defendant had invested about a million dollars, it was natural that he should keep an eye upon management. It is not perceived how any decision which he might have made to substitute new managers for plaintiffs, bears upon whether he intended to defraud them of their interests as stockholders.

The representations in reliance upon which plaintiffs testified that they transferred their shares to defendant, are not only improbable, but they are also in direct conflict with the written agreement which they signed dated December 20, 1949, and the instruments of assignment dated May 3, 1950. Plaintiffs' theory appears to be that they parted with their shares regarding third parties only, in order to enable defendant to borrow money more easily upon his own credit by pledging all of the common stock to Starrett, along with other collateral security, which would enable the lender to get control of the corporation with minimal legal complications if the loan were not paid. A further theory, not alleged in the complaint, was suggested at the trial, that defendant wanted the appearance of ownership in order to consolidate Starrett with another corporation owned by him, which had been operating at a profit, and thus to utilize Starrett's losses for tax purposes. Plaintiffs protest their ignorance of such a purpose, seeming to imply nevertheless that the transaction was a sham, having been designed to serve some unilateral purpose of this nature not disclosed by defendant.

Fraud is a serious charge, and the evidence necessary to establish it must be clear and convincing (*Lowendahl* v. *Baltimore & Ohio R. R. Co.*, 247 App. Div. 144, 158; *Lynch* v. *Gibson*, 254 App. Div. 47, affd. 279 N. Y. 634; *Benz* v. *Kaderbeck*, 241 App. Div. 583; *Shotwell* v. *Dixon*, 163 N. Y. 43, 52–53; *Uhlmann* v. *Hammons*, 74 N. Y. S. 2d 66). In this case, the version of the transaction presented by the written documents is more natural and probable than the oral testimony introduced to vacate it. When they entered into this contract dated December 20, 1949, and later when they made these assignments, plaintiffs had much to gain and little to lose. Defendant's initial investment of $10,000 had increased in two years to about $1,000,000.

He was completely in control of the situation, both as creditor and as holder of the preferred stock which had sole voting power. In reliance upon these assignments of plaintiffs' common shares, he transferred $269,000 of Starrett's then existing liability to him from loans to donated surplus. Plaintiffs' only hope had been to refinance the debt of Starrett to defendant, or to be instrumental in selling the business with defendant's consent. They attempted to do both, but without success. There is no inconsistency in the circumstance that they were still trying to find a purchaser for the business after the assignments of their shares had been made to defendant, in the hope that they could obtain a commission from the purchaser, or that they might arrange a sale on terms which would enable them by consent to participate on some basis, or to continue actively in the business. Neither is it material that defendant may have contemplated consolidation with another company, owned by him, in order to minimize corporate income taxation.

The contention is well made in defendant's behalf that there is little value in written contracts if transfers such as these can be set aside on such unsubstantial evidence.

If, as plaintiffs contend, the assignment of their common stock to defendant were merely to assist him in borrowing new money for the corporation upon his credit, and not to secure him for his loans to the corporation, then plaintiffs would have been entitled to the return of their shares when defendant repaid the new loans to his prospective lender out of avails of the sale of his real property. In that event, plaintiffs would not have felt under compulsion to refinance the loans from defendant to Starrett, in order to revest in themselves title to their shares. Their contract with defendant dated December 20, 1949, and the assignment of their shares, would have been sufficient for defendant to exhibit to his prospective lender. If there had been any collateral understanding between plaintiffs and defendant, such as is alleged in the complaint, that these shares were to be returned when defendant repaid his new loans from the proceeds of sale of his real estate, one would expect that it would have been incorporated in an exchange of correspondence or other writing between the parties themselves. At least, it would not be expected that there would be correspondence between them indicating that the understanding between themselves was the same as that which they had arranged to display to outsiders in order that defendant might borrow the new money which the corporation required. Yet that is what hap-

pened. At the time when the agreement dated December 20, 1949, was signed, defendant wrote a letter to plaintiffs and Starrett, by their request, stating that he was holding plaintiffs' shares pursuant to the aforesaid agreement, and promising to co-operate with them in obtaining a loan or loans on behalf of the corporation from banking or financial institutions. Such a letter would have been unnecessary and uncalled for unless the real understanding between these parties was correctly expressed in the written documents which have been set aside by the judgment appealed from, namely, that plaintiffs' common stock in Starrett was to revert to them when defendant was repaid his loans by Starrett, instead of when defendant paid the new loans which he was to procure for Starrett out of his personal assets.

The judgment appealed from should be reversed, with costs to the appellants, and plaintiffs' complaint dismissed, new findings made in accordance with the foregoing opinion and contrary findings reversed. Settle order.

COHN and CALLAHAN, JJ. (dissenting). While it is true that the effect of the judgment appealed from is to disregard various recitals and covenants in written agreements, such a result is not unusual or improper where the agreements are set aside on the ground of fraud.

In our opinion, there was sufficient evidence to warrant the findings by the trial court, which saw and heard the witnesses, that the assignment and agreement transferring the plaintiffs' shares had been procured through false representations. We think that the testimony of the disinterested witnesses called by the plaintiffs as to what the defendants had told them, and the testimony of the defendants' accountant with respect to a scheme to reduce the defendants' taxes support the plaintiffs' claim.

It might be more in accord with the equities of the case if all loans by defendant Freidus had priority over the plaintiffs' interest as stockholders. The earlier advances were taken care of by the issuance of preferred stock, but not a later " donation to surplus " in the sum of $269,000 made after Freidus acquired the plaintiffs' stock. We would, therefore, vote to modify the judgment so that as between the parties and their successors the defendant Freidus should be entitled to an additional priority of $269,000 over the rights of the plaintiffs as common stockholders. Otherwise we would affirm the judgment appealed from.

PECK, P. J., and BREITEL, J., concur with VAN VOORHIS, J.; COHN and CALLAHAN, JJ., dissent and vote to modify the judgment, in opinion.

Judgment reversed, with costs to the appellants and the complaint dismissed; new findings are to be made in accordance with the opinion herein and contrary findings reversed. Settle order on notice.