**Kurt SCHMIEDER, Plaintiff,**

**v.**

**Louis H. HALL, Jr., as Preliminary Executor of the Estate of Helen B. Dwyer, Defendant.**

**No. 69 Civ. 1939.**

United States District Court, S. D. New York.

Sept. 25, 1976.

See also D.C., 421 F.Supp. 1218.

Werner Galleski, New York City, Berg & Duffy, Lake Success, N. Y., for plaintiff, by James P. Duffy, III, Thomas A. Illmensee, Thomas F. Werring, Lake Success, N. Y., of counsel.

Turchin & Topper, Martin, Obermaier & Morvillo, New York City, for defendant, by John S. Martin, Jr., Morton J. Turchin, New York City, of counsel.

## OPINION

WHITMAN KNAPP, District Judge.

This six year old diversity action was tried without a jury on June 30 and July 1, 1976. Plaintiff Kurt Schmieder, a citizen of the Federal Republic of Germany, seeks to impress a constructive trust upon certain property of the estate of the late Helen B. Dwyer. The defendant Louis Hall, Jr., an attorney, is the executor and a principal beneficiary of the Dwyer estate.

In essence, the plaintiff claims that there was a gentlemen's agreement to return to him at some future time certain property which was transferred unconditionally and absolutely to Mrs. Dwyer in 1938. Plaintiff alleges that he was defrauded by Mrs. Dwyer who, he maintains, was acting on behalf of Louis Hall, Sr., the father of the present defendant, and the attorney who drafted all of the relevant documents relating to the transfer of the property.

The defendant, who is being sued in his capacity as executor of the Dwyer estate, vigorously denies the plaintiff's allegations. He contends that there were no such gentlemen's agreement, and that the gift to Mrs. Dwyer was, in fact, unconditional and absolute. Furthermore, the defendant claims that any interest that plaintiff may have had in the property was cut off in 1948 when his property was vested by the Alien Property Custodian pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et seq.*

After carefully considering all the testimony, depositions, and documents submitted in this case, we find for the defendant on both the above grounds, and, accordingly, dismiss the plaintiff's complaint.

## I. *Background*

■ The crucial events in this rather unique litigation occurred almost forty years ago, in 1938, when Helen Dwyer became the recipient of an "irrevocable and unconditional" gift of property, the beneficial owner of which had been plaintiff Kurt Schmieder. Moreover, in order to fully understand these events it is necessary to discuss occurrences which date back as far as World War I. Not surprisingly, with the exception of Schmieder, the principal protagonists in this dispute—Louis Hall, Sr., William Graupner, and Helen Dwyer—are all deceased.[1]

---

1. Defendant has urged that plaintiff is precluded from testifying about conversations with Louis Hall, Sr. and William Graupner by virtue of New York State's Dead Man's Statute, Section 4519, Civil Practice Law and Rules, McKinney's Consol. Laws of N.Y. c. 7B. We find that provision inapplicable, and accordingly, we have considered all relevant testimony submitted at trial in reaching our conclusions.

During Word War I, property owned by Schmieder's father was seized by the United States Government pursuant to the Trading with the Enemy Act. 50 U.S.C. App. § 1 *et seq.* In 1928, as his father's sole heir, Schmieder received the return of an amount equal to eighty percent of the value of the property seized. Shortly thereafter, Schmieder devised a scheme to evade legitimate German property taxes on the money thus returned to him.[2] The evidence indicates that he divided the returned property into two funds. The larger fund was not reported to the German taxing authorities, while the smaller fund was. In the early 1930s, this unreported account was transferred into the name of Schmieder's sister-in-law, Jenny Bochmann, a resident of Switzerland.

Thus, the situation stood in 1934 when the Nazis came into power. The relevance to this lawsuit of that historical event is that the Nazi regime enacted increasingly severe penalties—culminating in the possible sentence of death—for those who concealed property abroad. This factor led Mrs. Bochmann (who had a son living in Germany) and Schmieder to take a series of steps in order to disassociate themselves from the unreported funds. In 1935, Schmieder met Louis Hall, Sr., who was then vacationing in Germany. The meeting took place at the house of a mutual acquaintance, William Graupner. There, Schmieder asked Hall certain general questions concerning the formation of a corporation to hold securities in the United States, and the tax consequences of establishing such a corporation. Hall, Sr. was a senior partner in the New York law firm of Putney, Twombly & Hall, the firm that had

previously represented the corporation owned by plaintiff's father which had been the original source of plaintiff's American wealth.

In the fall of 1936, Graupner returned to the United States and told Hall, Sr. that his law firm should draw up the necessary papers to establish a personal holding corporation for a woman named Jenny Bochmann. Acting pursuant to these directions, Hall Sr. supervised the formation of Stoneleigh Corporation. All the shares of Stoneleigh were issued to Mrs. Bochmann in consideration for the transfer to the corporation of the assets in Mrs. Bochmann's name which had been in an account at the New York Trust Company. Herman Graupner, William Graupner's son, was named president of Stoneleigh. Louis Hall, Jr., then an associate in his father's firm, helped draft the papers creating Stoneleigh.

In April, 1937 William Graupner received a letter from Jenny Bochmann stating that she no longer wanted her name used for Stoneleigh and that she wanted to sever all connections with the corporation. Graupner discussed the matter with Hall, Sr., who indicated that there was no way that the property could be held in the United States with the names of the true owners concealed. Hall advised that since Mrs. Bochmann wished to divest herself of all interest in the property, and since Schmieder himself could not take the property back to Germany,[3] the only solution would be to give the assets of Stoneleigh away.[4]

William Graupner returned to Germany in the summer of 1937 and told Schmieder what Hall had said. Schmieder was hesitant at first, but by the fall of 1937, he decided to take Hall's advice. He notified

**2.** From 1925–1931, Germany had a property tax, and a resident of Germany was required to include property located outside Germany in his property tax return. Failure to disclose such property was a criminal offense. In 1931, the maximum sentence for this offense was increased from two years to ten years imprisonment. In addition, beginning in 1931, Germany enacted foreign exchange controls which required citizens to report their foreign holdings. By 1932, the maximum penalty for failure to report was also ten years imprisonment.

**3.** To the extent such a finding is at all relevant, we find that Hall, Sr. knew by this time that Schmieder was the beneficial or real owner of the assets of Stoneleigh Corporation.

**4.** We are, of course, not concerned in this litigation with whether the legal advice rendered by Hall, Sr. was correct or not. It should be noted, however, that plaintiff has not suggested any alternative course that could have been legally followed.

Graupner of his decision, explaining that since they had last spoken he had been called in by the German authorities to make a report concerning his foreign holdings. According to Graupner, it was expressly stated to Schmieder that the gift must be absolute with "no strings attached." Schmieder supposedly agreed, and told Graupner that he and Hall should take care of all the necessary arrangements, including the choice of a donee. At the time of this discussion, Schmieder gave Graupner a slip of paper upon which he wrote in German: "I am in agreement with the arrangement which we have discussed for my sister-in-law." [5]

Upon Graupner's return from Europe, he and Hall began to take the necessary steps to dispose of the Stoneleigh Corporation assets. After discussing the possibility of making either of their respective sons the recipient of the gift, they decided that the property should be given to Helen Dwyer, then Hall Sr.'s personal secretary. The necessary papers were drafted by the elder Hall, forwarded to Switzerland, and finally signed and returned by Mrs. Bochmann. Among the papers pursuant to which the gift was made was a letter dated March 15, 1938, from Mrs. Bochmann to Mrs. Dwyer which stated:

"I am the owner of the outstanding stock of Stoneleigh Corporation . . . . I wish to make an absolute gift to you of both my stock in the said corporation and of my claims for advances against it . . . ."

The value of the Stoneleigh stock at the time was approximately $120,000.

Helen Dwyer had been the elder Hall's secretary since 1929. Born in 1895, she was orphaned at the age of three and from 1898 to 1914 lived with her aunt and uncle. During the First World War, she married a man who was in the Navy. Tragically, however, early in the 1920s her husband was committed to a mental institution, run by the Veterans Administration, where he

remained until his death. Hall, Sr. maintained that it was Mrs. Dwyer's unfortunate past that had prompted the decision to make her the beneficiary of the Stoneleigh assets.

Despite her new wealth, Mrs. Dwyer's lifestyle did not undergo any radical shift. Although she moved from Brooklyn to a larger more expensive apartment on Central Park South in Manhattan, she continued to work as Hall, Sr.'s personal secretary. She expended from the assets of the property approximately $2,000 per year for personal expenses. Shortly after the gift, she had the first of a long series of wills drafted which left the bulk of her estate to various members of Hall, Sr.'s family.

In October, 1941, with war between the United States and Germany imminent, the United States Treasury issued regulations requiring the registration of all property held by United States citizens for or on behalf of foreign nationals. After discussing the matter with Hall, Sr., Mrs. Dwyer contacted a lawyer, not involved with the Stoneleigh transaction, in order to obtain his opinion as to what action she should take. The attorney, George Z. Medalie, Esq., advised her that it would be best to report to the government the facts surrounding the gift.

On October 31, 1941, Mrs. Dwyer reported the unconditional gift on Treasury Form TFR–300. Thereafter, on June 30, 1943, her accounts containing the property she received from Stoneleigh were blocked by the government. From August 1, 1943 to October 15, 1948 Mrs. Dwyer filed nineteen applications for licenses to use some of the funds or for unblocking. She consistently maintained during this period that the gift from Bochmann was genuine and irrevocable, and that she was not holding the property on behalf of any person other than herself.

In December, 1948, the Alien Property Custodian issued Vesting Order No. 12528, whereby he seized all of the property which

---

5. As is obvious, this statement is highly ambiguous and sheds no light whatsoever on the discussions between Graupner and Schmieder.

Mrs. Dwyer had received from Stoneleigh on the ground that it was the property of Kurt Schmieder. Mrs. Dwyer, in turn, commenced an action seeking the return of the property, claiming that it had been received by her as an absolute and unconditional gift. In 1951, a settlement was reached in the suit pursuant to which 55 percent of the seized property was returned to Mrs. Dwyer. A crucial piece of evidence which led to the settlement was a signed statement by Schmieder, obtained on June 1, 1945, which read:

"The undersigned confirms herewith that it is understood by him that the gift of Mrs. Bochmann's bank balance with the New York Trust Company and of securities deposited there to Mrs. Dwyer is a voluntary, absolute and irrevocable gift, without any obligation of Mrs. Dwyer."

The statement was witnessed by a Dr. Alfred Lindner, who was apparently a mutual friend of Schmieder and William Graupner.

The plaintiff now contends that this absolute gift was subject to a gentlemen's agreement, whereby it was intended that the money transferred to Mrs. Dwyer would sometime in the future be returned to him. He claims that the perpetrator of the fraud against him was Louis Hall, Sr., who acted as his attorney in the transaction, and whose family will now end up with the bulk of the Stoneleigh assets since Hall's children are the principal beneficiaries of the Dwyer estate. Schmieder charges that Mrs. Dwyer knew of this gentlemen's agreement, and acted as the agent for Hall, Sr. in the perpetration of the fraud.

## I. *Plaintiff's Standing to Sue*

Before turning to the merits of the factual dispute, it is first necessary to determine whether, in light of the govern-

ment's vesting order of 1948, plaintiff Schmieder still has any interest in the subject property. The defendant contends that the vesting order terminated every interest of plaintiff—legal or equitable, vested or contingent—in the property transferred to Dwyer. We agree.[6]

On December 15, 1948 the Office of Alien Property issued Vesting Order 12528 entitled "Stock Owned by and Debts Owing to Kurt Schmieder." The order began by stating that Schmieder was a resident of Germany and thus a national of a designated enemy country. The order went on to list various securities in Mrs. Dwyer's name which were traceable to the gift from Mrs. Bochmann and stated that such property was

"property within the United States owned or controlled by, payable or deliverable to, *held on behalf of or on account of,* or owing to, or which is evidence of ownership or control by, Kurt Schmieder the aforesaid national of a designated enemy country (Germany);" (emphasis added)

The order concluded:

"THERE IS HEREBY VESTED in the Attorney General of the United States the property described above, to be held, used, administered, liquidated, sold or otherwise dealt with in the interest of and for the benefit of the United States."[7]

Subsequent to the vesting of this property, Mrs. Dwyer brought suit for the return of the property to her on the ground that Schmieder did not have any interest in the property. As noted above, the lawsuit was settled pursuant to a stipulation which provided that Mrs. Dwyer would be given securities having a value of 55 percent of the total amount seized.

---

**6.** Although this specific issue may have been decided in plaintiff's favor either directly or indirectly by other district judges to whom this case had been previously assigned, we cannot now avoid the responsibility of considering the question *de novo. Dictograph Products Company v. Sonotone Corporation* (2d Cir. 1956) 230 F.2d 131, 134–6, *cert. dism.* 352 U.S. 883,

77 S.Ct. 104, 1 L.Ed.2d 82 (Judge Learned hand). See, also, *Rodriguez v. Olaf Pedersen's Rederi A/S* (E.D.N.Y.1974) 387 F.Supp. 754.

**7.** The original Vesting Order, Exhibit 12–A, was subsequently amended, but only to the extent of changing the description of the securities vested. See Plaintiff's Exhibit 12–B.

The statute, pursuant to which Schmieder's interest in the property held by Mrs. Dwyer was vested, provides that with respect to any seized property, the Alien Property Custodian

> "shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof."

50 U.S.C. App. § 12. The Supreme Court has held that under the Trading with the Enemy Act alien enemy owners are divested of every right—beneficial as well as legal—in respect of money and property seized. *Cummings v. Deutsche Bank* (1936) 300 U.S. 115, 120, 57 S.Ct. 359, 81 L.Ed.2d 545; *Woodson v. Deutsche, etc., Vormals* (1934) 292 U.S. 449, 454, 54 S.Ct. 804, 78 L.Ed. 1357. See also, *Balkan Nat. Ins. Co. v. C. I. R.* (2d Cir. 1939) 101 F.2d 75, 77; *United States v. Borax Consol.* (N.D.Cal. 1945) 62 F.Supp. 220, 223.

■ It thus seems clear that if Schmieder had any interest in the property conveyed to Mrs. Dwyer, that interest was totally extinguished when the vesting order was issued. At that moment, the Alien Property Custodian had full and complete title to the property, and had the authority to deal with that property in any manner appropriate to the interests of the United States, including the settlement of a claim with a third party. Indeed, since the claim that the government settled when it reconveyed certain property back to Mrs. Dwyer was a claim that Schmieder retained some beneficial interest in the property, it seems apparent that the very interest Schmieder asserts in this action is the one which was subject to the vesting order and ultimately disposed of in its settlement with Mrs. Dwyer.

■ Furthermore, the cases interpreting the Trading with the Enemy Act have uniformly held that a divested alien has no right to pursue an action against a subsequent transferee from the United States

for the return of vested property. In *Mutzenbecher v. Ballard* (S.D.N.Y.1925) 16 F.2d 173, aff'd (2d Cir.) 16 F.2d 174, *cert. denied* 273 U.S. 766, 47 S.Ct. 571, 71 L.Ed. 881, plaintiff, a German co-partnership, sought to collect certain commissions earned by the defendant in the United States to which the plaintiff was in part entitled. Plaintiff's interest, however, had been seized by the Alien Property Custodian. The court held that upon seizure only the Alien Property Custodian could institute suit against the defendant for the commissions. It went on to state (16 F.2d at 174):

> "Where the Alien Property Custodian has made a disposition of seized property of an enemy alien, including the adjustment of an alleged claim, such settlement cannot be attacked by the enemy alien, nor has the enemy alien any standing in a suit brought against the one with whom the Alien Property Custodian has settled."

Similarly, in *Munich v. First Reinsurance Co.* (2d Cir. 1925) 6 F.2d 742, *appeal dismissed* 273 U.S. 666, 47 S.Ct. 458, 71 L.Ed. 830, the Alien Property Custodian had seized stock in the defendant corporation which was owned by the plaintiff, a German corporation. Thereafter, the Custodian sold the property, and out of those proceeds, paid the defendant, who had asserted a claim against the plaintiff, a sum of about $50,000. In affirming the dismissal of plaintiff's complaint against the defendant for a return of that money, the Court of Appeals explained (6 F.2d at 747):

> "[The] complainant, at the time the Custodian seized and sold its shares of stock in the defendant company, was, in our opinion, divested of all right, title, or interest in the property, and in the proceeds realized by the subsequent sale of the property. It could not thereafter reclaim the property from the person to whom it was sold. It had no right to or interest in the proceeds of the sale, and no right to reclaim any portion thereof which the Custodian paid over to a third person in settlement of a claim which such person had against the enemy."

In the face of such established legal precedent, the plaintiff sets forth three arguments in support of his position that he has standing to bring this action.

■ First, Schmieder argues that the vesting order related solely to specific items of property and was carefully drafted so as not to deprive him of any equitable claims against Mrs. Dwyer. Plaintiff, however, has suggested no motive as to why the Alien Property Custodian would wish to attach an alien enemy's legal interest in specified property and not his equitable interests as well. Such a disposition would clearly contravene the purposes of the Trading with the Enemy Act,[8] and we are convinced that in this case such a result was clearly not intended.

■ Secondly, plaintiff claims that even if he had a beneficial interest in the property at the time of the vesting, this interest was regained when the government reconveyed certain of the properties back to Mrs. Dwyer. This argument, too, must be rejected. As noted above, once vesting occurs, the Alien Property Custodian becomes the actual owner of the seized property. He has the right to sell the property, or to settle claims involving the property. When these events occur, however, the divested owner cannot regain any previously lost rights in the property. The whole scheme of the Act militates against such a result. 50 U.S.C. App. § 7(e) provides that those who deliver money or property to the government pursuant to a vesting order are fully discharged of their obligations with respect to that property "for all purposes." Such transferors may not be held liable in any court for their compliance with a vesting order. Furthermore, as indicated above, subsequent transferees from the government cannot be sued by one whose property has been vested. Indeed, the Act explicitly states that the sole remedy available to an enemy alien is an action against the government on the ground that the vesting order was improper. See, 50 U.S.C. App. § 7(c) and § 9.[9]

■ Finally, the plaintiff argues that his claim for fraud did not arise until long after the vesting order was issued and the property returned to Mrs. Dwyer. He maintains that "the equitable duty to make restitution to Schmieder did not arise until the late 1960s when Schmieder learned for the first time that Dwyer, the Halls, and the Graupners had 'conspired' and acted to keep the property." This argument, however, ignores the fact that whatever equitable interests Schmieder had in the property arose on the very day in 1938 when it was transferred to Mrs. Dwyer. While his failure to discover the fraud until the 1960s would affect the running of the statute of limitations, it could in no way alter the fact that his interest on the property pre-dated the vesting order. And, as noted above, whatever that interest was, it was totally extinguished by the seizure of the property by the Alien Property Custodian.

## II. *Merits*

Although we have found that the plaintiff does not have standing to pursue this action, we deem it appropriate, in the event that ruling should be overturned, to proceed to a decision on the merits.

As we have seen, the basic factual issues in this dispute concern the arrangements made when the Stoneleigh Corporation assets were given to Mrs. Dwyer. Schmieder claims that Hall, Sr. and Graupner had

---

8. In *United States v. Chemical Foundation* (1926) 272 U.S. 1, 9–10, 47 S.Ct. 1, 4, 71 L.Ed. 131, the Supreme Court stated:

"The purpose of the Trading with the Enemy Act was not only to weaken enemy countries by depriving their supporters of their property, . . . but also to promote production in the United States of things useful for the effective prosecution of the war." (cite omitted)

The Court indicated that the Act should be "liberally construed to give effect to the purposes it was enacted to subserve." See, also, *Clark v. Uebersee Finanz-Korp.* (1947) 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88.

9. Plaintiff relies heavily on *Craig v. Bohack* (2d Dept. 1963) 19 A.D.2d 891, 244 N.Y.S.2d 737. To the extent this case supports plaintiff's position, we feel it should be disregarded as an incorrect statement of federal law.

agreed that the property would be returned to him at some future time. He claims that Mrs. Dwyer knew of this gentlemen's agreement when she took the property, and that acting in concert with Hall, Sr. reneged on the promise.

■ At first blush, there appears to be substance to the plaintiff's charges.[10] Mrs. Dwyer never—to the day of her death—met Schmieder or Mrs. Bochmann. She was chosen as the donee by her employer, Louis Hall, Sr., who, at the time, was acting as Schmieder's attorney in the disposal of the funds. Mrs. Dwyer had a personal and trusting relationship with Hall, and probably would have accepted the gift of property conditionally had Hall requested her to do so. Shortly after receiving the gift, she executed the first of a series of testamentary instruments all of which were drafted by or at the direction of Louis Hall, Sr., or Louis Hall, Jr., and all of which named members of the Hall family as primary beneficiaries. When, after the war, Schmieder tried to get in contact with Mrs. Dwyer, she acted in a singularly ungracious fashion, considering that Schmieder had been the ultimate source of her wealth and, whatever his motives, had rendered significant assistance in her efforts to get the property back from the government. Finally, no reasonable explanation for her conduct in this regard was even proffered.

■ However, having considered all these and other facts and circumstances, we conclude that singly or in combination they do not establish that in 1938 Mrs. Dwyer and Louis Hall, Sr. embarked upon and consummated a conspiracy to defraud Schmieder. In this connection we observe that while generally either a constructive trust[11] or fraud[12] must be proved by clear and convincing evidence, we do not feel that plaintiff would have established his case even if normal civil standards of proof were to prevail.[13]

Analyzing the evidence we start out with a realization that plaintiff Schmieder is a highly unsatisfactory witness. He knowingly and wilfully perpetrated a scheme in the early 1930s to evade legitimate property taxes imposed by the German government in the days of the Weimar Republic, a circumstance that can hardly be explained—as his attorneys attempt to—as hostility to the Nazis. Secondly, his present position in this lawsuit is directly antithetical to his sworn statement in 1948 that the gift to Mrs. Dwyer had been irrevocable and unconditional. This statement was a critical motivating factor in the government's decision to settle the Dwyer lawsuit, and we reject plaintiff's claim that he had no idea of the statement's purpose at the time it was made.

In addition to the unsatisfactory nature of Schmieder's testimony, we must also observe that every other participant in the transaction at issue—Mrs. Dwyer, Hall, Sr., and William Graupner—has specifically repudiated and contradicted Schmieder's testimony. Moreover, although Mrs. Dwyer and Hall, Sr. might be assumed to have had

10. The government, when it vested the Dwyer properties in 1948, obviously thought that some agreement to return the property to Schmieder existed. Judge Holtzoff, who presided over the suit filed by Mrs. Dwyer to reclaim the vested property, in fact indicated during that proceeding that he felt Mrs. Dwyer had no title in the property, and was simply a "straw". (Plaintiff's Trial and Evidence Memorandum at 10). Obviously, since the action in that case was settled by stipulation, and never formally tried by Judge Holtzoff, his remarks are not binding.

11. See, *Lundy v. Murtagh* (Sup.Ct.1955) 141 N.Y.S.2d 247, appeal dismissed 285 App.Div. 1217, 143 N.Y.S.2d 820, and cases cited therein.

12. *McDonnell v. American Leduc Petroleums* (2d Cir. 1972) 456 F.2d 1170; *Fein v. Starrett Television Corp.* (1st Dept. 1952) 280 App.Div. 670, 116 N.Y.S.2d 571, *aff'd* 305 N.Y. 856, 114 N.E.2d 210.

13. If Hall, Sr. had himself accepted the gift from his client Schmieder, the burden would have been upon him to establish the propriety of his conduct. See, *In re Bartel's Will* (4th Dept. 1970) 33 A.D.2d 987, 307 N.Y.S.2d 260; *Howland v. Smith* (3rd Dept. 1959) 9 A.D.2d 197, 193 N.Y.S.2d 140. However, that doctrine cannot be here invoked in the absence of proof that he was in a conspiracy with Mrs. Dwyer.

selfish motives that might have prompted false testimony,[14] no one has suggested a reason why William Graupner would also commit perjury. All that is known about him is that he was a friend of both Schmieder and Hall, and that neither he nor his son either had or hoped for any interest in the property given to Mrs. Dwyer.

Setting to one side considerations of veracity, and turning to the probabilities of the situation, they lean more in defendant's direction than in plaintiff's. Looking at the matter from Schmieder's point of view, it must be remembered that in 1938 when the gift was made the Nazi regime was at its height and no one—least of all a resident of Germany—would have been likely to anticipate that the regime would be lying in ruins in seven short years. Moreover, what Schmieder was seeking to avoid was the risk of being put to death upon discovery that he had been hiding foreign assets. In these circumstances, it seems more probable that he would have wished to get rid of all traces of ownership by an absolute gift rather than enter into some "gentlemen's agreement" which might conceivably have come to the attention of the Nazi authorities. Of course, many years later—with Nazi power only an unpleasantly remembered nightmare—Schmieder's recollections of his 1938 sentiments might have undergone a drastic change.

From Hall, Sr.'s and Mrs. Dwyer's point of view, it seems improbable that they would have undertaken the risks of playing fast and loose with their own government just to enable Schmieder (practically a stranger to Hall and a total stranger to Mrs. Dwyer) to outwit his.

With respect to Mrs. Dwyer's ultimate use of the money for the benefit of the Hall family, while it might generate suspicion, it cannot serve as a basis for a finding of fraud. It is clear that Mrs. Dwyer had a high regard for her employer and his family. There is no showing in the record that she had any close relationships with any members of her own family. She was aware of the fact that it was Mr. Hall who designated her as the recipient of the gift. It cannot therefore be thought unnatural that she should have decided to make the Hall family the recipient of her bounty upon her decease.[15]

This leaves only what we have described as Mrs. Dwyer's ungracious conduct at the time Schmieder tried to make contact with her, and the defendant's total failure to offer any rational explanation for such conduct. This troubled the court during the trial, and still does. While it would be easy to postulate an explanation for the conduct it is difficult to imagine why none was offered. As to a possible explanation, Mrs. Dwyer had after all taken an oath in a federal court that there were no strings attached to the property in her hands and that she owed Schmieder absolutely no duty to account for the same. She might very well have feared that any conduct on her part inconsistent with such a position—such as even a meeting or a discussion with Schmieder—could have caused the government to reopen its case or might even have landed her in jail for perjury. But if

---

14. Even so, it must be born in mind that Hall, Sr., a respected member of the New York Bar and a name partner in a leading law firm, cannot lightly be thought to have assumed the risks of committing perjury before a federal court in an action against the United States government. In this connection, we note that over plaintiff's strenuous objection we allowed two witnesses to give character testimony on behalf of Hall, Sr. This may well have been technical error. The testimony was allowed at a time when we felt we would probably find for plaintiff and were anxious to let the defendant build up the best record possible for purposes of appeal. However, if error it was, we can certify it was harmless beyond a reasonable doubt. We were well aware of the reputation of Hall, Sr. and his firm, and all the testimony accomplished was to confirm our then suspicion that Hall, Jr., was not being candid about his awareness of the events of 1938. That suspicion has since subsided in light of Schmieder's acute need for secrecy. At that time, Hall, Sr. may well have been proceeding on a "need to know" basis in making disclosures to his son.

15. Mrs. Dwyer also loaned money to Hall, Jr. during her lifetime, but the same considerations would seem to apply to that transaction.

**1218**

such—or anything like it—were the cause of Mrs. Dwyer's conduct, Hall, Jr., who was advising her in the matter, must have been aware of these considerations and could easily have testified concerning these motivations. Nevertheless, neither ungracious conduct on Mrs. Dwyer's part in 1967, nor lack of candor on Hall, Jr.'s part—if such there was—in 1975, are sufficient (separately or taken together) to support a finding that Mrs. Dwyer and Hall, Sr. had in 1938 embarked upon and consummated a conspiracy to defraud.

## CONCLUSIONS

In summary, we find that plaintiff has no standing to pursue this action, and, in the alternative, that plaintiff has failed to satisfy his burden of proof. Accordingly, the complaint must be dismissed.

The foregoing shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.