ESTATE OF Yaron UNGAR,
et al., Plaintiffs,

v.

The PALESTINIAN AUTHORITY,
et al., Defendants.

No. 18 MS 0302(CM).

United States District Court,
S.D. New York.

Oct. 11, 2005.

David J. Strachman, McIntyre, Tate, Lynch & Holt, Providence, RI, Robert J. Tolchin, New York, NY, for Plaintiffs.

Ramsey Clark, Ramsey Clark & Lawrence W. Schilling, New York, NY, Maher H. Hanania, Hanania & Khader, John E. Coffey, Aaron S. Book, Reed Smith LLP, Falls Church, VA, Stavroula Elias Lambrakopoulos, Stephen Gregory Topetzes, Kirkpatrick & Lockhart, LLP, Washington, DC, for Defendants.

Christopher M. Curran, White & Case, LLP, Washington, DC, for Orascom Telecom Holding S.A.E.

DECISION AND ORDER GRANTING MOTION OF NON–PARTIES KHALED BICHARA & ORASCOM TELECOM HOLDINGS S.A.E. TO QUASH SUBPOENAS DATED JUNE 9, 2005

MCMAHON, District Judge.

## Introduction

Mr. Khaled Bichara, an Egyptian citizen and domiciliary, traveled from Egypt to New York in June 2005 for sentencing in a criminal matter. While present before the Southern District, he was served with subpoenas pursuant to Fed.R.Civ.P. 45 for himself and for Orascom Telecom, an Egyptian telecommunications company of which he was a board member to testify in the above matter. Mr. Bichara and Orascom Telecom moved to quash the subpoenas on the grounds of lack of sufficiency of service of process, lack of personal and subject matter jurisdiction, and failure to comply with the "100–mile rule" of Fed. R.Civ.P. 45. They further objected to the scope of the subpoenas and requests for document production.

Because Mr. Bichara was immune from service of process while in New York, the subpoenas for Mr. Bichara and for Orascom Telecom (as served on him) are quashed.

## Facts

On June 9, 1996, Yaron Ungar, a U.S. citizen, and his wife Efrat were killed in a machine-gun attack while traveling in Israel. Memorandum of Law in Opposition to Motions to Quash at 2 (*hereinafter*, Opp.). In March 2000, Mr. Ungar's estate filed suit against, among others, the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") in federal district court in Rhode Island. *Id.* The action sought damages under the Antiterrorism Act, 18 U.S.C. § 2333(a) (2000), which creates a cause of action for an American national, or his estate, killed or injured by reason of an act of international terrorism. *Id.* After extensive procedural maneuvering, default judgment was entered for the plaintiffs and damages awarded in the amount of $116,409,123.00 plus fees; the judgment was upheld by the First Circuit Court of Appeals. *See Estates of Ungar & Ungar ex.rel. Strachman v. Palestinian Authority*, 325 F.Supp.2d 15 (D.R.I.2004), *aff'd sub nom. Ungar v. Palestine Liberation Organization.*, 402 F.3d 274 (1st Cir. 2005) (rehearing denied May 20, 2005). In an effort to collect this amount, the Plaintiffs registered their judgment in the Southern District of New York pursuant to 28 U.S.C. § 1963 in May 2005. Opp. at 3. The plaintiffs have since pursued domestic assets controlled by the PLO and PA. *Id.*

Orascom Telecom Holding S.A.E. ("Orascom Telecom") is an Egyptian corporation doing business directly or through subsidiaries across North Africa and the Middle East. Opp. at 3. It provides mobile telecommunications services, satellite communications, and Internet access services to individuals and corporate customers. *Id.* A controlling majority of Orascom Telecom is owned by Naguib Sawiris and his family; a large minority is publicly traded. *Id.* at 4. In 2001–2002, a sizable block of shares in several Orascom Telecom subsidiaries was acquired by the Palestinian Authority's Investment Fund. *Id.* at 6. In early 2005, Orascom Telecom reacquired these shares in exchange for an estimated $340 million in cash and debt. *Id.* This debt has been identified by the Ungar estate as a potential source of Palestinian assets to satisfy its judgment. *Id.*

Orascom Telecom is one of the Orascom family of companies, each apparently controlled by the Sawiris family, which also includes Orascom Construction Industries, Orascom Hotels and Development, and Or-

ascom Technology Solutions. Standard and Poor's *Initial Report on Valuation and Transparency as of January 1, 2003* (Feb. 25, 2003) at 178 (Respondent's Exhibit C).

The extent of Orascom Telecom's presence and operations in the United States is currently in dispute. Its management denies owning any assets or transacting any significant business within the United States. Declaration of Amr Esmat Abaza (Petitioner's Exhibit 8).[1] The Ungar estate, however, alleges extensive contacts between Orascom Telecom and various American entities, including an American Depository Receipt placement arrangement with the Bank of New York and "extensive" dealings with the United States government. Opp. at 22.

Khaled Bichara (also called Khaled Bishara, or Khaled G. Bishara) is a citizen and domiciliary of Egypt. Memorandum in Aid of Sentencing, *U.S. v. Bishara,* at 2 (Respondent's Exhibit O) (*hereinafter,* "Sentencing"). He is the founder of LINKdotNET, previously known as "Link," an Egyptian Internet service provider and web hosting facility. *Id.* at 3–4. In mid–1999, Orascom Telecom acquired a controlling interest in LINKdotNET, although Mr. Bichara continued to operate as its chief executive. *Id.* at 3. At present, he is also a member of the board of directors of Orascom Telecom and, apparently, its "Chief Internet Strategist." Opp.at 11.

In 2001, LINKdotNET entered into a series of contracts for the acquisition of telecommunications equipment from Saudi Egyptian Logistics and Electronics Company, known as SALEC; as part of these transactions, Mr. Bichara and SALEC applied to the United States Agency for International Development's (USAID) Commodity Import Program, which underwrites loans for the sale of American-made goods to foreign companies. Sentencing at 9. The proceeds of this loan were used to acquire new equipment, but also to repay debt owed by LINKdotNET to SALEC from prior dealings; this use of funds was not detailed in Mr. Bichara's filings with USAID.[2] *Id.* at 8. This misrepresentation contravened 18. U.S.C. § 1001, which prohibits making false statements in applications to USAID. *Id.* at 1. This misrepresentation was detected, and LINKdotNET was sanctioned and fined by USAID and the Egyptian Ministry of Cooperation. *Id.* at 12.

Mr. Bichara was arrested on July 10, 2004 while traveling in the United States to attend a business conference in Atlanta, Georgia. Transcript of Oral Argument, *Ungar v. Palestinian Authority* (Sept. 13, 2005) at 38. On March 8, 2005, before Magistrate Judge Frank Maas in the Southern District of New York, he pled guilty to a one count criminal information based on the misstatements made in the USAID filings. Transcript of Hearing, *U.S. v. Bishara* [sic] (March 8, 2005) at 16 (Petitioner's Exhibit 7A). The terms of his bail, originally imposed the previous July, were modified to permit his return to Egypt until his sentencing hearing. *Id.* at 17.

---

1. Respondents in this action have sought to strike the affidavit of Mr. Abaza or, in the alternative, to require him to be present for deposition regarding the contents of his affidavit. Because I do not rely on the affidavit, I decline to rule on respondent's request and take no position as to the accuracy of its contents.

2. There also appears to be some question, not material here, as to whether Mr. Bichara was aware of the legitimacy of SALEC's U.S. subsidiary, "Cyber Crossing, Inc."

On June 14, 2005, Mr. Bichara returned to the United States for sentencing. Declaration of Marko C. Maglich at ¶ 1 (Petitioner's Exhibit 7) (*hereinafter,* "Declaration"). Upon his arrival, he was "paroled" into the country by United States Customs and Border Protection officials—that is, he was admitted to the country without a determination of his immigration status solely for the purpose of attending the sentencing hearing. *Id.* at ¶ 3. He was accompanied by United States Customs and Border Protection or Department of Justice personnel at all times. At the hearing, he was sentenced to pay a fine of $250.00 and an assessment of $100.00. *Id.* at ¶ 9.

While in the courtroom and just prior to being sentenced, Mr. Bichara was served with the following papers in the matter of *Ungar v. Palestinian Authority:* (1) a subpoena duces tecum for himself as a non-party deponent; (2) a subpoena duces tecum for Orascom Telecom, served on Mr. Bichara in his capacity as a director and/or officer of that company; and (3) a number of state court papers including a "Restraining Notice Pursuant to CPLR § 5222" and a "Verified Petition Pursuant to CPLR §§ 5225 and 5227." Declaration at ¶ 8. This Court does not consider the validity of the state court papers or service thereof.

Mr. Bichara and Orascom Telecom timely moved to quash the above two subpoenas, based on lack of sufficiency of service of process, lack of personal and subject matter jurisdiction, and failure to comply with the "100–mile rule" of Fed.R.Civ.P. 45. They further objected to the scope of the subpoenas and requests for document production. The motions of Mr. Bichara and Orascom Telecom have since been consolidated.

## Discussion

### Service on Mr. Bichara

■ Federal Rule of Civil Procedure 45 grants federal courts the power to issue subpoenas to non-parties to compel testimony or the production of documentary evidence in an ongoing case. This power, however, is not absolute; "the subpoena power of a court cannot be more extensive than its jurisdiction." *U.S. Catholic Conf. v. Abortion Rights Mobilization, Inc.,* 487 U.S. 72, 76, 108 S.Ct. 2268, 2270, 101 L.Ed.2d 69 (1988). The Due Process Clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940) and *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). Alternatively, personal jurisdiction may be acquired by valid personal service of process on an individual physically present within a state, even if that individual lacks sufficient minimum contacts with the state to be subject to long-arm jurisdiction upon her departure. *See Burnham v. Superior Ct. of California,* 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990); *see also Kadic v. Karadzic,* 70 F.3d 232, 247 (2d Cir.1995) (upholding "tag" service of process on non-U.S. citizen temporarily present in New York).

The circumstances of Mr. Bichara's appearance in the Southern District, however, implicate a further jurisdictional limitation. At common law, "witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service of process in

another." *Lamb v. Schmitt*, 285 U.S. 222, 225, 52 S.Ct. 317, 318, 76 L.Ed. 720 (1932). This immunity was not, traditionally, a right of individuals, but rather a privilege of the court. *See id.* ("a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation.").

Such immunity, however, was subject to broad exceptions. While there is near-unanimity as to immunity for parties in *voluntary* attendance before the court, there is considerable division of authority as to whether the privilege extends to those *compelled* to be present, such as persons who are in custody, free on bond, or compelled by court order to appear as a witness.

In New York, state and federal courts disagree on the correct rule to apply to criminal defendants on bail and non-parties who are appearing in court under subpoena. The state rule was laid down in *Netograph Manufacturing Company v. Scrugham*, 197 N.Y. 377, 90 N.E. 962 (1910), in which an out-of-state defendant, having voluntarily entered New York, was arrested and released on bail. The defendant subsequently returned to New York for trial, in which he was acquitted. Before he could return to Ohio the next day, he was served with process in an unrelated civil action. The court held that the privilege against service did not apply when the party was present before the court under compulsion of law. *See id.* at 380, 90 N.E. at 963. The court further held that the freedom granted the defendant while on bail, while less restrictive than physical custody, nevertheless did not render his appearance before the court voluntary.

*See id.* at 382, 90 N.E. at 963. *Netograph* has been followed by nearly all subsequent cases in New York courts. *See, e.g., Matthews v. Matthews*, 30 Misc.2d 681, 683, 222 N.Y.S.2d 31, 34 (N.Y.Sup.1961); *Rosenblatt v. Rosenblatt*, 110 Misc. 525, 180 N.Y.S. 463, 465, 38 N.Y.Crim. R. 254 (1920).

The state court decision in *Netograph* was promptly distinguished by New York's federal courts. In *Dwelle v. Allen*, 193 F. 546 (S.D.N.Y.1912), a witness subpoenaed to give testimony before a federal grand jury in New York was served with a summons and complaint in an unrelated civil state court proceeding while present in New York. Upon removing the second action to federal court on diversity, the defendant moved to quash the subpoena on grounds of immunity. In his ruling quashing the summons, Judge Learned Hand differentiated the case before him, in which the petitioner was compelled by subpoena, from *Netograph*, in which the party remained in the custody of bail. *See Dwelle*, 193 F. at 548. However, the court went further than merely distinguishing *Netograph* and indicated a separate federal immunity principle: "[T]he proper test is not, I think, whether the appearance be voluntary or not, but whether the privilege will promote the purposes of justice." *Dwelle*, 193 F. at 548–49.

After *Dwelle*, the Second Circuit (albeit largely in dicta) maintained the federal rule granting immunity from service whenever a person was present in the jurisdiction for court appearances, regardless of whether he was present voluntarily or under compulsion. *See McDonnell v. Am. Leduc Petroleums, Ltd.*, 456 F.2d 1170, 1179 (2d Cir.1972); *Higgins v. Cal. Prune & Apricot Growers*, 282 F. 550, 559 (2d Cir.1922) ("it is equally clear that the privilege extends to every proceeding of a judicial nature."); *but see In re Hall*, 296 F.

780, 782 (S.D.N.Y.1924) ("The rule in the federal courts is that a person temporarily and *voluntarily* within the district for the purpose of attending in a state or federal court, either as a witness or a party, civil or criminal, is exempt from the service of process.") (emphasis added).

The federal judiciary as a whole follows a similarly broad rule. *See Stewart v. Ramsay,* 242 U.S. 128, 130, 37 S.Ct. 44, 61 L.Ed. 192 (1916) ("The true rule . . . is that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance on the court."); *see also Adamy v. Parkhurst,* 61 F.2d 517, 517 (6th Cir.1932) ("[H]ad service been made while the appellee was in actual custody . . . whether he was appearing voluntarily or under compulsion, . . . such service would have been invalid"); *Church v. Church,* 270 F. 361, 363 (D.C.Cir.1921) ("[W]hether we view his appearance as voluntary or involuntary, we think the privilege attached to him").

In *Lamb v. Schmitt,* 285 U.S. 222, 225, 52 S.Ct. 317, 318, 76 L.Ed. 720 (1932), a second exception to the broad federal immunity rule was defined. The Court held that immunity did not attach where, "the immunity itself, if allowed, would so obstruct judicial administration in the very cause for the protection of which it is invoked as to justify withholding it." *Id.* at 228, 52 S.Ct. 317. The Court found that test to be met where the second matter was one sufficiently legally or factually related to the first such that service of process on the party could not have been unexpected. *See id.*

The Second Circuit has further clarified the *Lamb* exception. In *McDonnell v. American Leduc Petroleums, Ltd.,* 456 F.2d 1170 (2d Cir.1972), a New Jersey domiciliary subpoenaed to give testimony at a bankruptcy proceeding in New York was served with a complaint alleging that he had committed fraud against the bankrupt company. The Second Circuit held that service was proper in light of the Supreme Court's decision in *Lamb.* "As these two proceedings involve vindication of the same *cluster of rights and interests* . . . . [a]ccordingly, it within the discretion of the district court to withhold immunity." *McDonnell,* 456 F.2d at 1180 (emphasis added).

Other circuits have done likewise. In *Greene v. Weatherington,* 301 F.2d 565 (D.C.Cir.1962), the petitioner, a Maryland resident charged with assault in Washington D.C., his place of employment, was served while in criminal custody in the courthouse jail. The civil summons and complaint sought damages arising out of the same assault for which he was currently on trial. The D.C. Circuit indicated that the particular facts of the service were sufficient to deny immunity, given the physical custody of the petitioner at the time of service and the factual connection between the criminal case and the civil complaint for damages.

 In the instant case, Mr. Bichara was present before the court solely for sentencing for violation of a Federal law. Indeed, he was paroled into the country solely for that purpose. Neither the State of New York nor its courts had any involvement with the underlying criminal proceeding that brought Bichara here. As such, the application of federal law, rather than the state rule, is proper. *See Marlowe v. Baird,* 301 F.2d 169, 170 (6th Cir. 1962).

Application of the Second Circuit rule, which applies regardless of compulsion to appear in court, requires that the subpoenas be quashed. If, as Judge Hand stated, the proper test is not whether a person's attendance was voluntary, but whether im-

382 382

munity may induce compliance with the directives of the court (and I think that is the proper test), then treating a party who is present under compulsion of bail (as Mr. Bichara was) differently from one under compulsion of a subpoena (as in *Dwelle*) makes no sense.[3] The *McDonnell* exception, requiring a "cluster of rights and interests" between the first and second actions, is clearly not applicable here. Mr. Bichara's criminal proceeding concerning false statements to USAID has nothing whatever to do with the Ungar estate's action against the PLO and PA. Therefore, the clearest and best rule requires quashing the subpoenas, irrespective of the voluntariness of Mr. Bichara's attendance at court.

Application of this rule seems especially apt in view of the fact that Mr. Bichara is a foreign national returning to the United States to face criminal charges. Under the "principle of specialty," foreign citizens extradited to the United States to face criminal charges may not be served with process in an unrelated civil matter. *See United States v. Rauscher,* 119 U.S. 407, 430, 7 S.Ct. 234, 30 L.Ed. 425 (1886). While this rule is over a century old, and has been increasingly questioned, *see Van Cauwenberghe v. Biard,* 486 U.S. 517, 524–26, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988) (questioning the scope of the rule in dicta), *U.S. v. Nosov,* 153 F.Supp.2d 477, 480 (S.D.N.Y.2001) (discussing deviation from the rule in other circuits), it remains the rule in the Second Circuit. Given that rule, an individual who did not comply with the requirements of his bail, and thus had to be extradited to the United States to face sentencing, would seem to be immune from service of a subpoena to testify in an unrelated civil matter. For this Court to deny immunity to Mr. Bichara for *compliance* with the terms of his bail seems illogical.

*Service on Orascom Telecom*

■ Mr. Bichara was served not only as an individual, but as a director or officer of Orascom Telecom. The question is whether this service sufficed as service on Orascom Telecom. The answer is no.

■ As a general rule, "where service of process is insufficient, the courts have broad discretion to dismiss the action or to retain the case" *Montalbano v. Easco Hand Tools, Inc.,* 766 F.2d 737, 740 (2d Cir.1985) (internal citations omitted). Although the fact pattern above has not been raised in the Second Circuit, the Eleventh Circuit has addressed it directly: "[immunity] applies to a nonresident officer or agent of a foreign corporation where service is attempted in an action against the corporation while such officer or agent is present in the jurisdiction for the sole purpose of attending the trial of another cause, and is not there on any other business of the corporation." *Walker v. Calada Materials Co.,* 309 F.2d 74, 76 (10th Cir.1962). If a person is immune from service of process, that immunity must extend to his professional as well as personal capacities to possess any force. As such, I also quash the subpoena on Orascom Telecom that was given to Mr. Bichara.

Respondents have since made several other attempts to reach Orascom through service on other directors or officers also temporarily present within the United States. I do not here opine on the legal sufficiency of those efforts. Nor does this decision address the other arguments

---

3. The validity of Mr. Bichara's bail agreement is not questioned. Were voluntariness an issue, a question might be raised as to whether his presence was "compelled" either by his bail agreement or by his custodial parole arrangement with the Bureau of Customs and Border Protection. That question need not be answered here.

made by Orascom Telecom in favor of quashing those subpoenas.

### Conclusion

The subpoenas on Khaled Bichara and Orascom Telecom Holdings S.A.E., dated June 9, 2005, given to Mr. Bichara are quashed.

This constitutes the decision and order of this Court.